ROWE *v.* STATE

No. 41945          January 8, 1962          136 So. 2d 220

*John H. Shands,* Tupelo, for appellant.

G. *Garland Lyell, Jr.*, Asst. Atty. Gen., Jackson, for appellee.

KYLE, J.

The appellant, John Rowe, was indicted, tried and convicted in the Circuit Court of Clay County on a charge of murder in the killing of George Wheeler, and was sentenced to imprisonment in the state penitentiary for the term of his natural life. From that judgment he prosecutes this appeal.

The difficulty which led up to the killing and the shooting itself occurred about 2:00 o'clock A. M. during the night of November 26-27, 1960, at a house which was occupied by the deceased, George Wheeler, and Delphia Gibbs, about 4-1/2 miles east of the City of West Point. It appears from the testimony that George and Delphia, though not married, lived in the house and sold barbeque

sandwiches, soft drinks and home brew, although Delphia denied that they sold home brew. Several persons were present when the fatal shot was fired, including Alice Johnson and Carl Hayes, who had driven to the house with the appellant in the appellant's automobile, and Willie Hill and Ollie B. Thomas, who had entered the house only a few minutes before the shooting occurred.

Delphia Gibbs testified that she and George had been living in the house about two months; that they sold "a little barbeque and sometimes a pop — something * * * like that;" that they had no dancing in the house, no room for dancing; but they had a combination record player and radio. Delphia stated that George was in the kitchen, when the appellant and his two companions came to the door and knocked about 2:00 o'clock Sunday morning; that her nephew, J. W. Gibbs, had borrowed George's gun to go possum hunting in the woods nearby; that George was sitting in the kitchen listening to the dogs bark, and had dropped off to sleep. Delphia stated that she heard the knock at the door and got up, and she told George that some one was at the door. George went to the door and came back to tell her that the late callers wanted some barbeque. Delphia told George to fix the barbeque. George went back to the kitchen, and after a time came back into the hall with some records for the record player. Delphia stated that after the record playing started, "they kept up so much of fuss back there and raised so much of sand," she put a housecoat on and went back to the kitchen and asked George what was the matter. George said he had asked them out of the house. Delphia told George to go out in the hall and she would take care of the matter herself. Delphia stated that George left the kitchen, and when he came back down the hall, he was "popping his fingers and dancing;" that she was standing in the door leading into the kitchen, and the appellant was standing behind her; that the appellant shot over her shoulder; that she

whirled and grabbed his hand and begged him not to shoot any more. Delphia stated that she did not know that the appellant had shot the deceased until she heard Carl Hayes say to him, "Don't shoot him no more." Delphia stated that she turned the appellant loose, and he ran and jumped out the window; that she heard George say, "Please carry me to the doctor;" that she went to the door and called for help, and Willie Hill came back into the house and helped carry George to the hospital. Delphia stated that George did not have a pistol, a shotgun, a knife or a weapon of any kind in his hand when he was shot.

On cross-examination Delphia denied that the appellant and his two companions had purchased a quart of home brew. She denied that the fuss grew out of Alice Johnson's drinking the balance of the contents of the pitcher of home brew which George had left on the table after each of the three guests had been served a glass full. She stated that there was no one in the hall at the time of the shooting except George. The others were in the kitchen. Delphia denied that she told Charlie Lancaster, who later testified as a witness for the appellant, the morning after the shooting, that the appellant and his two companions came there and bought a quart of home brew and that George became enraged when Alice Johnson drank a little that was left in the bottle, and that George got in a fuss with the appellant and came back to the door of the kitchen with a shotgun, and the appellant shot him. She stated that she had no conversation of any kind with Charlie Lancaster the next day.

Willie Hill testified that, when he was on his way home from town the night of the homicide, he saw a car parked at George Wheeler's and Delphia Gibb's house, and he stopped there to get a sandwich and listen to the music. Ollie B. Thomas was with him. It was after 1:00 o'clock. The combination radio and phonograph machine was playing when he went in. There was a little

argument going on, but he didn't pay much attention to that. He saw Delphia Gibbs and George Wheeler and John Rowe and other people, whom he did not know. He remained in the hallway and never did enter the kitchen. He saw George Wheeler popping his fingers and dancing, and he heard a pistol shot. After he heard the shot he peeped in; and when he peeped in, he peeped in the face of the gun. He did not see the shot fired; but John Rowe had the gun, and he had his hand over Delphia's shoulder; and it looked like he was trying to shoot again. Willie stated that he tried to get out through the back door, but he never could get it open, and he finally got out through the front door. When he got to the porch he saw the appellant's car leaving. He then backed his own car out, and as he was leaving for home Delphia called him from the house, and he went back and helped carry George to the hospital. Willie stated that he at no time saw George with any type of weapon, pistol, shotgun, or knife, and George was not threatening the appellant in any manner when he was shot.

Ollie B. Thomas testified that he and Willie Hill went to George's house together. Delphia let them in. When he walked up the hall he heard an argument, and he told Delphia to fix him a sandwich and let him get out. He was in the kitchen only a few minutes when he heard a shot. When the shot was fired he went under the table, and he heard Delphia say, "they shot him." He then heard a window crash; and he saw somebody getting out of the window with a revolver in his hand, and when he came from under the table, he heard Delphia say, "They shot him." He then walked out of the kitchen into the hall. George's wound appeared to be only a flesh wound, and he told George to get up; but George grew weaker almost instantly, and had to have support to keep from falling. Ollie stated that he did not see any shotgun, pistol, rifle or weapon of any kind that George had at the time. Ollie stated that he and Willie got the

truck and carried George to the hospital. On cross-examination Ollie stated that he did not see any home brew when he got to George Wheeler's house, and he did not know what George and the defendant were arguing about. He stated that the appellant was standing in the kitchen when he shot George; and that he shot him through the door leading from the kitchen into the hall.

Dr. Harvey Flowers testified that he was called to the emergency room of the hospital at an early morning hour on November 27, 1960, to see a wounded patient. When he arrived, he found that George Wheeler had been shot. The bullet had passed through the lower anterior chest wall and had lodged in the back to the left of the patient's spine just under the skin. He removed the bullet with very little effort. It appeared to be a 38-caliber bullet. George Wheeler died a short time thereafter as a result of the bullet wound.

The appellant, John Rowe, testified that he drove his automobile to the house occupied by George Wheeler and Delphia Gibbs on the night of the homicide to get something to drink. Alice Johnson and Carl Hayes were in the car with him. He got out of the car and went to the door and knocked. George Wheeler opened the door and told them to come in. The appellant asked him what he had to drink. George said to him, "I ain't got nothing but some home brew." The appellant told him that they would take that, and the appellant and his two companions then went down the hallway and into the kitchen. George set three glasses on the table, left the room and came back with a pitcher half full of home brew. He then went back out and put a record on the record player. Alice Johnson soon emptied her glass and refilled it with the home brew that had been left in the pitcher. George came back and asked who had drunk the home brew that was left in the pitcher. Alice told him that she had drunk the home brew. George asked her if she did not know that it was not for her. She told him that she was sorry,

and that she would pay for it. George said he didn't want any pay, "I don't want no * * * pay * * *. I don't want nobody coming here taking over." Delphia Gibbs came into the kitchen and asked what the trouble was. They told her, and Delphia then said to George, " * * * go on and take the money * * * and forget about it." George said, "Just wait here." George then left the kitchen and returned later with a double barrel shotgun, and said, "Get me that s.. o.. b.. out of there." Delphia started toward him, but George waived his gun and "pulled the spacers off", and Delphia fell over against the wall and hollered. The appellant stated that he was middle ways of the table, and when Delphia fell back George pointed the gun downward at him, and he upped and fired, and then ran and jumped out of the window. The appellant stated that the reason he did not go out the door was that George was in the door on his knees with the shotgun across his lap. On cross-examination the appellant stated that it was about midnight or after midnight when he arrived at Wheeler's place. He had been out to the "Chicken Shack" before that, and when he left the "Chicken Shack" he drove back to Wheeler's and got some home brew. The appellant stated that he had been convicted in the city court for gambling, speeding and drinking. He denied that he had been convicted of any other offenses.

Alice Johnson and Carl Hayes also testified as witnesses for the appellant. Their versions of the killing and the events which led up to the killing were substantially the same as that of the appellant. Two character witnesses testified that the appellant's reputation for peace and violence was good.

J. W. Gibbs was called to testify as a State's witness in rebuttal. Gibbs testified that Delphia Gibbs was his aunt; that he went to her house about 9:30 Saturday night and stayed there until 1:00 o'clock; that he then borrowed George Wheeler's double barrel shotgun and

George's dogs to go hunting in the woods nearby. He stated that he came back about daylight and put the gun on the bed beside the wall. No one was at the house when he returned. He did not know George Wheeler had been shot at that time.

Tommy Smith, Chief of the Police Department of the City of West Point, testified that he had been City Court Clerk for the past several years, and that the appellant had been convicted of misdemeanors in the city court six times. Smith had in his hand a list of the offenses for which the appellant had been convicted. The appellant's attorney objected to Smith testifying concerning the number of convictions and the nature of the offenses, and insisted that the docket was the best evidence. The county attorney stated that if the appellant's attorney wanted to take the time, he could turn to each page of the docket. The appellant's attorney then said: "Thats all right, just overrule the objection and go on, I just want it in the record that I objected to it." The court then overruled the objection. The witness then stated that the record showed that the defendant had been convicted in city court six times: For gambling, driving while his driver's license was revoked; improper muffler and speeding; running a stop light; reckless driving and speeding and running a red light; and that the defendant had been down there in the city court on a charge of disturbing the peace, but that charge had been dismissed.

The appellant's attorney argues two points as ground for reversal of the judgment of the lower court: (1) That the court erred in overruling the defendant's objection to the testimony of the Chief of Police of the City of West Point; that it was improper to go into the details of the prior convictions; and (2) that the court erred in overruling the defendant's motion for a directed verdict at the conclusion of all of the evidence on the

ground that the State had failed to meet the burden of proof necessary to sustain a conviction.

■ ■ There is no merit in the appellant's contention that the court erred in permitting the Chief of Police of the City of West Point to testify that the appellant had been convicted in the city court of several misdemeanors. The appellant had admitted that he had been convicted of only three misdemeanors. The Chief of Police testified that he had been convicted of at least six different offenses. No attempt was made to go into the details of the convictions. The only details given were the number of convictions and the nature of the offenses. ■ ■ It was error for the prosecuting attorney and the witness to refer to the charge of disturbing the peace, which had been dismissed; but no motion was made to exclude that part of the answer relating to the charge of disturbing the peace which was dismissed; and the error in any event was harmless.

■ ■ After a careful review of the testimony we are of the opinion that there was no error in the action of the trial judge in overruling the defendant's motion for a directed verdict at the conclusion of all of the evidence. ■ ■ There was a sharp conflict in the testimony of the witnesses for the State and the witnesses for the defense; and the question as to the appellant's guilt or innocence was a question for the jury to decide. At least two eye witnesses testified that the deceased had no deadly weapon in his hands or about his person at the time the fatal shot was fired. The jury had a right to believe from the testimony of the State's witnesses that the appellant shot the deceased at a time when he was in no real or apparent danger of being killed or suffering great bodily harm at the hands of the deceased. The jury had a right to reject the appellant's claim that he fired the fatal shot in defense of his own life.

We find no reversible error in the record and the judgment of the lower court is affirmed.

Affirmed.

*McGehee, C. J.,* and *Gillespie, McElroy* and *Jones, JJ.,* concur.