[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 334 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 335 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 336 
Frank J. Cabello, Sr. appeals his conviction of capital murder and sentence of death by a jury in the Circuit Court of Alcorn County.
On December 23, 1982, Hoyt Horn found Vernon Gurley, a 72 year old used car dealer, dead in Gurley's trailer office in Corinth, Mississippi. Gurley was "hogtied," bound by rope and according to Horn taped "solid all over his nose and all around *Page 337 
his mouth and face." Horn removed the tape from Gurley's mouth and attempted to revive him; failing in this he called the police.
At approximately 2:05 p.m. Officer Billy Burns arrived at the scene and noted, among other things, that the office safe was open and there was an adding machine on the floor.
Dr. Charles Thomas McLees performed an autopsy on Gurley and testified in his opinion the cause of death was strangulation. Because the body had been in a heated room, Dr. McLees was unable to determine the time of death but estimated Gurley had been dead from six to twenty-six hours.
Dr. McLees' conclusion that Gurley was strangled was based on the observation that "His trachea was compressed from the twine that had been around him; he had marked pulmonary edema, [and] . . . he had marked edema fluid in his mouth and nose" and Gurley's larynx was collapsed. This condition according to the witness had to have been caused from extreme external pressure.
Investigators received their first clue from an unidentified woman who phoned the night of December 23 and stated the perpetrators were two young boys in an orange car. Two days later officers deduced that L.C. Hamm, who had made a car payment to Gurley on the afternoon of December 22, was the last person not involved in the crime to see Gurley alive. Hamm had seen "two young boys in an orange car" near the trailer office and gave officers information sufficient to render composite drawings. Police took these to the Ramada Inn near Gurley's office and used car lot and questioned the employees there. From this interrogation it was decided that Frank Cabello, Sr. [hereinafter Frank, Sr.], Frank Cabello, Jr. [hereinafter Frank, Jr.], and Rico Anthony Cabello were suspects.
Ramada Inn Manager David Coln testified a man who identified himself as Frank Cabello, Sr., phoned him at approximately 9:00 a.m. on December 21 stating his two sons were enroute to Corinth but that he would be detained in Birmingham, Alabama, until the following day. Frank, Sr. asked Coln to put the boys up for the night; assuring him that he would pay the bill the following day. Frank, Jr. and Rico, his younger brother, approximately 16 and 13 years old, arrived at the Ramada Inn about 12:30 that afternoon in a small orange car with luggage tied on top. The older boy signed the registration card "Frank Cabello" giving a California address and car license number. The boys were assigned Room L 37.
The following day Frank, Sr. phoned Coln, stating he was having car trouble but would arrive in Corinth that afternoon to pay the bill. While in the motel parking lot that afternoon, Coln observed that the older Cabello boy, the registrant, had recorded a license number on the registration card different from that on the automobile. Upon calling the police department, Coln was informed their licensing checking equipment was not functioning, precluding an investigation that day. Shortly thereafter Coln left work and did not return until the next morning, when he discovered the Cabellos had left the premises.
In December 1982, Becky Settlemires was a maid at the Ramada Inn. When she arrived to prepare Room L 37 on December 21, it was occupied by a brown haired boy, of about 16 years wearing blue jeans. After leaving the room and upon her return in a few minutes she saw a man "in blue striped pants and a blue top" who "looked like he needed a shave and had on glasses." A younger boy was also in the room. While Settlemires was cleaning the room, the man sat on the dresser and picked up a card with Settlemires' name on it. According to her, "Well, he picked up my card and asked me was my name Becky and I turned around and said, `Yes.'" The following day Settlemires entered the Cabellos' room at approximately 11:30; at that time "the older man and the older boy came out and the little boy stayed in there" with her. Settlemires identified the older person in L *Page 338 
37 on December 21 and 22 as the defendant.
Rico Cabello, 14 years of age at time of trial, testified for the state in return for its recommendation that his case be remanded to the Youth Court of Alcorn County. Rico testified that in December 1982, he had been traveling with his brother Frank, Jr. and his father in an orange Mustang automobile. When they arrived in Corinth on December 21, they stopped at a phone booth "up the road from the Ramada." There Frank, Sr. called the motel and arranged for Frank, Jr. and Rico to be put up for the night. They then left their father "at a restaurant on 72" and went to the motel to check in. Then Rico left Frank, Jr. at L 37 and returned to the restaurant for his father, and both came back to the motel.
On either December 21 or 22, Rico and Frank, Jr. took a walking tour of several motor vehicle dealerships, including Gurley's car lot. Rico testified he spoke to Gurley, who had been outside his office charging a battery on one of his cars. Later they returned to the motel and told their father what they had observed. At that point Frank, Sr. cursed Rico for having told Gurley they were staying at the Ramada. Thereafter Frank, Sr. and Frank, Jr. "started wiping the room down" to remove fingerprints and instructed Rico to finish the job when they left on foot.
Frank, Sr. and Frank, Jr. returned about thirty minutes later in a "rust colored, reddish" car which Rico had seen earlier at Gurley's car lot. Frank, Sr. got out of the car, knocked on the door, told Rico to get his heart medicine and get into the Mustang, which was already packed with the Cabellos' belongings.
Frank, Jr. drove Gurley's car, followed by Frank, Sr. and Rico in the Mustang, down a "side road" where Frank, Jr. abandoned it and got into the car with his father and brother. As they were driving away, Frank, Jr. "remembered that he had left that survival rifle in the car." Frank, Sr. returned to Gurley's car where they retrieved the rifle.
The Cabellos then proceeded on Highway 72 toward Memphis, Tennessee. Rico testified concerning a conversation which occurred while they were traveling, "My father asked Frank to give him the money." Frank, Jr. complied, later throwing several items out the car window. When asked if he remembered what his brother and father said they had done to Mr. Gurley, Rico replied, "They said hog-tied him and put tape on his mouth and eyes."
Frank, Jr. and Rico were arrested in New Braunfels, Texas, on December 26. Pursuant to that arrest the Mustang was impounded and subjected to an inventory which revealed rope behind the driver's seat, a roll of duct tape, and a .22 calibre handgun. The boys were released the following day.
By authority of a warrant from Mississippi, Frank, Sr. was arrested in Torrance, California, on January 5, 1983. Again, the Mustang was impounded and searched pursuant to warrants from the Superior Court of Los Angeles County and from the Circuit Court of Alcorn County, Mississippi. Officers found, among other things, a rope, duct tape, a road map with a circle around Corinth, a .22 calibre RG revolver and two boxes of ammunition. Expert testimony established the rope and duct tape were similar to that found on Gurley's body and could have come from the same source.
In the interest of succinctness we have consolidated some of the appellant's assignments of error in order to discuss in a single proposition those involving related facts and issues. However, we emphasize we have considered each assignment individually.
 I.
DID THE COURT ERR IN DENYING FRANK, SR.'S MOTION FOR A CHANGE OF VENUE OR A CONTINUANCE?
Frank, Sr. argues the court should have sustained his motion in view of pervasive community hostility and pre-trial publicity which undermined his rights to an impartial *Page 339 
jury and a fair trial. His sworn motion is supported by the affidavits of one W.M. Henson and defense attorney, W.W. Odom, Jr., as well as being buttressed by the introduction of numerous newspaper accounts of the crime.
Granting or denying change of venue is within the sound discretion of the trial court and its action will not be reversed absent a clear abuse of that discretion. Billiot v. State,454 So.2d 445, 454 (Miss. 1984); Wilcher v. State, 448 So.2d 927, 930 (Miss. 1984).
In overruling Frank, Sr.'s motion for change of venue the trial court noted,
 Normally a motion for change of venue is heard before the jury is impanelled and voir dired and also the rules of the court provide that motions of this type should be filed by the first day of the term. I think this case has been set for trial now approximately one month or five weeks, . . . and this is the third week of the term and the motion has not been brought up until today when the jury came in and the special venire reported.
The court stated further that only five of the 80 prospective jurors had indicated they had heard of the case and formed an opinion about it. We assume, since the issue is not raised, that none of the five were called as jurors to decide the case. From these facts, we cannot say that the trial court abused its judicial discretion in denying Frank, Sr.'s motion.
 II.
DID RICO'S TESTIMONY INJECT INADMISSIBLE HEARSAY INTO THE TRIAL?
During the direct examination of Rico Cabello, the district attorney asked, "Rico, do you remember while you were traveling down Seventy-Two your father and brother telling you that they hog-tied Mr. Gurley?" At that point defense counsel objected on the ground "that is terribly abusive." The court overruled the objection, stating that a "certain amount" of leading would be allowed in view of Rico's hesitancy and reticence. A bench conference ensued, followed by the following colloquy:
 [BY DISTRICT ATTORNEY]
 Q. Rico, what do you remember about what your father and brother said about what they did to Mr. Gurley?
 A. They were talking.
 Q. Do you remember anything about a rope?
 A. They said hog-tied him and put tape on his mouth and eyes.
 Q. On his mouth and eyes?
 A. That is what my brother said.
 BY DEFENSE ATTORNEY: Objection to hearsay, your Honor.
 BY JUDGE BIGGERS: Overruled.
 Q. Rico, when your brother made that statement was it in the car with your father? When your brother told you that about tying up Mr. Gurley and putting tape on his mouth and eyes, did he say that when your father was there in the car with you and him?
 A. Yes.
Frank, Sr. asserts Rico's statements contained impermissible hearsay which violated his constitutional right to confront the witnesses against him. For explanation it need be noted that Frank, Jr. was called as a witness but interposed his Fifth Amendment right not to testify. Rico's statement of what Frank, Jr. said was therefore not subject to cross-examination. In this context it is our opinion that Rico's testimony concerning the statements of his brother was hearsay. However, each Justice of this Court including the writer has in solemn deliberation considered the significance of the hearsay testimony in conjunction with the state's extensive evidence indicative of Frank, Sr.'s guilt and each is of the opinion the admission of this testimony was not prejudicial and does not constitute reversible error.
 III.
DID THE COURT ERR IN OVERRULING FRANK, SR.'S MOTION IN LIMINE TO PROHIBIT THE STATE FROM CALLING FRANK, SR.'S CHILDREN AS WITNESSES?
Defense counsel based their objection to the state's calling Frank, Jr. and *Page 340 
Rico on a parent-child privilege. In support of their contention that the privilege should have been honored here, they citePeople v. Fitzgerald, 101 Misc.2d 712, 422 N.Y.S.2d 309 (1979), a Westchester County court case. That court held there was a parent-child privilege arising from the right of privacy between parent and child. In it an adult son had a 15 to 20 minute conversation with his father concerning an automobile accident from which charges were pressed against the son. The privilege was upheld, not permitting the father to testify. However, the case recognized the narrow limitations in which it might be employed by stating the privilege must be "mutually" asserted. Additionally, the context of that case indicates the privilege there in issue was largely directed to the confidences a son or daughter might reveal to a parent in expectation of guidance through counseling or moral support. Because the factual situation is so vastly different, we do not find the case persuasive to confirming decision in this case. We do permit under certain circumstances the testimony of a child against parent or spouse against spouse, and we do not believe any privilege extends to the situation now before us either through inference or analogy. We conclude this assignment is without merit.
 IV.
DID THE COURT ABUSE ITS DISCRETION IN PERMITTING THE PROSECUTION TO LEAD ITS PRIMARY WITNESS?
Upon objection by defense counsel to the state's propounding leading questions to Rico Cabello, the court stated,
 As far as the reason for allowing a certain amount of leading of the witness [Rico Cabello], it was obvious . . . [Rico] was a young man of tender years and the court observed that he was rather uncomfortable in testifying and the court can certainly understand that being, testifying against his father when he is just a few feet from him, looking at him. It would be understandable that he would be reluctant and hesitant to testify and under those conditions the court feels that a certain amount of leading is permissible.
In view of the unusual circumstances, a son testifying against his father in a capital murder case, and the age and demeanor of this witness, we cannot conclude the court abused its discretion in overruling defense counsel's objection. We are therefore of the opinion proposition IV is without merit. Palmer v. State,427 So.2d 111, 115 (Miss. 1983).
 V.
DID DISCLOSURE OF THE AGREEMENT BETWEEN RICO AND THE STATE IMPERMISSIBLY AFFIRM RICO'S TESTIMONY?
Prior to the direct examination of Rico Cabello, the prosecutor informed the jury and the court,
 That the State has told Rico Cabello and his attorney . . . in the event that Rico Cabello cooperates fully with the State in the investigation of the robbery and killing of Vernon Gurley and testified truthfully at any trial or hearing in this matter, and further if the evidence shows that Rico Cabello was not actually present when Vernon Gurley was robbed and killed and that his participation in this crime was relatively minor, then the State would recommend to this court that the pending case against Rico Cabello . . . be remanded to the Youth Court of Alcorn County . . .
On cross-examination defense counsel questioned Rico regarding this agreement in order to attack his credibility. Frank, Sr. now argues the prosecutor's disclosure of the agreement signaled to the jury that the state was in effect vouching for the testimony of Rico Cabello.
The Fifth Circuit addressed this issue in United States v.Martino, 648 F.2d 367 (5th Cir. 1981). In it the court admitted the written plea bargain agreement between the state and the witness. Afterward counsel cross-examined the witness *Page 341 
regarding his plea agreement. The Court of Appeals held the agreement did not constitute "an impermissible affirmation or bolstering by the prosecutor of the credibility of a government witness. The statement in the plea agreement that Noriega promised to testify `truthfully' does not constitute error-laden vouching for the credibility of a government witness." 648 F.2d at 389. Likewise, we do not think the disclosure of the agreement to remand Rico's case to the Youth Court amounted to state endorsement of Rico's testimony.
Moreover, defense counsel used the agreement to attack Rico's credibility on cross-examination. Thus the offer by the state and its acceptance by Rico, with its potential for truthfulness or falsehood in his testimony, was placed before the jury for their resolution. Jurors, of course, are the ultimate triers of fact and they are aided in this endeavor by the varied experiences and knowledge reposed in them which contributes to the composite wisdom of the jury selected and sworn for the resolution of factual disputes arising during the course of the trial. UnitedStates v. Martino is persuasive to us that there is no merit in this assignment of error. See also, King v. State,363 So.2d 269 (Miss. 1978), wherein we held that an agreement between the state and one of its witnesses must be disclosed to the jury to allow that factor to be evaluated with other factors in considering the verity of the witness.
 VI.
DID THE COURT ERR IN PERMITTING INTRODUCTION OF EVIDENCE CONCERNING CERTAIN WEAPONS AND SUSPICIOUS ACTS?
Frank, Sr. first contends the trial court improperly admitted the survival rifle and the .22 revolver absent proof that these were used in this crime. However, we have held articles such as tools or weapons found near the place where defendant was arrested may be admitted into evidence. Hubbard v. State,437 So.2d 430, 436 (Miss. 1983); Wilkins v. State, 264 So.2d 411, 413 (Miss. 1972). The record indicates Frank, Sr. was arrested in California in the same automobile that was seen in Mississippi and searched in Texas. Additionally, we are of the opinion the rifle and revolver had legitimate probative value to corroborate Rico's testimony and were therefore properly admitted into evidence.
Secondly it is argued Frank, Sr. was prejudiced by testimony concerning the arrest and incarceration of the Cabello boys in Texas shortly after the crime in Corinth, Mississippi. The testimony of a New Braunfels police officer was introduced to show the legality of the inventory search of the Cabellos' automobile, which produced evidence introduced in the present trial. Obviously, it was essential to the introduction of such evidence to show that it was obtained by a constitutionally permitted search. The jury heard no details of the offense; the officer simply said, "They [the boys] were under detention for an offense committed in our city." Further, defense counsel interposed no objection.
We are of the opinion there was no error in the introduction of this testimony.
 VII.
WAS FRANK, SR.'S RIGHT TO A FAIR TRIAL UNDERMINED BY THE ADMISSION OF AUTOPSY PHOTOGRAPHS?
The state introduced 14 photographs of the body of the victim (State's Exhibits 3 through 16). The first seven depicted Gurley's body as it was found in his office and were admitted without objection. The latter seven showed the body on an autopsy table at Magnolia Hospital. Defense counsel objected to the admission of the last five photographs, Exhibits 12 through 16.
As a general rule the admission of photographs is within the discretion of the trial court. However, "gruesome photographs which have no evidentiary purpose and which only arouse the emotions of a jury should not be admitted . . ." Sharp v.State, 446 So.2d 1008, 1009 (Miss. 1984). While reversal for gruesome and/or cumulative photographs is rare, we have advised judges and prosecutors to "use great caution *Page 342 
in this area." Holliday v. State, 455 So.2d 750, 752 (Miss. 1984).
Exhibit 12, showing the body of Gurley lying on his back on the autopsy table, was taken at Dr. McLees' request "to illustrate where the tape was wrapped tightly around the posterior part of his neck and mouth and to illustrate that portion of the tape that had gone up and covered his nose . . .". For this reason this photograph does not lack probative value in our opinion.
Exhibit 12 showed Gurley partially unclothed and was made "to demonstrate the pressure marks on his larynx, where the rope had been around his neck and had crushed his larynx." (Testimony of Dr. McLees) Exhibit 14 "was taken to illustrate how tightly bound his wrists were and also show abrasions and bleeding from the struggle." (Testimony of Dr. McLees)
Exhibit 15 was taken "to illustrate the livor on the dependent side of the body and also to illustrate the pressure where he was lying on the floor." In contrast to Exhibit 14, which revealed the left wrist and did not show the livor, Exhibit 15 depicted the right wrist with deep rope marks.
Finally, Exhibit 16 showed the lower torso and illustrated the tightness with which Gurley's ankles were bound.
While we do not endorse the wholesale introduction of gruesome photographs, we cannot conclude, in view of the medical testimony and the cause of death, that the court abused its discretion in admitting these photographs, each portraying some evidence not shown by the others. For this reason we are of the opinion there is no merit in this proposition.
 VIII.
DID THE COURT ERR IN REFUSING TO REMOVE JUROR MAYHALL FOR CAUSE?
During voir dire defense counsel asked potential jurors whether they were acquainted with Deputy Sheriff Terry Doles, who was to testify for the state. Ms. Mayhall indicated she had known Doles approximately seven years and saw him once or twice a week. When asked whether she could remain impartial should there be a conflict between Doles' testimony and that of another witness, she replied, "I would believe Mr. Doles because I know him personally."
Defense counsel moved to strike Mayhall for cause. The court responded, "Well, Ms. Mayhall said she would listen to both sides before she decided and I will take her word for it." Frank, Sr. now contends this ruling was reversible error.
The defendant in Gilliard v. State, 428 So.2d 576 (Miss. 1983), raised a similar argument. In that case defendant had six unexercised peremptory challenges at the time he accepted a full panel. We held, "The trial court will not be put in error because of failure to permit a challenge for cause as long as peremptory challenges remain unused." 428 So.2d at 580.
Since the peremptory challenges were not included in the record, we cannot ascertain whether the defendant had unexercised peremptory challenges when he accepted the panel. Therefore we do not hold the trial court in error for failure to strike Mayhall for cause. We also note the trial court was of the opinion the juror would consider both sides of the case before reaching a conclusion.
We next observe Officer Doles, with whom Mayhall was acquainted, testified only briefly as to the chain of custody of State's Exhibits 18 and 19 (rope and tape taken from the body). Since defense counsel did not cross-examine this witness, we do not think Doles' credibility was in crucial issue; from this we conclude Mayhall's acquaintance with Doles had no bearing on this case. We think proposition VIII is without merit.
 IX.
DID THE COURT ERR IN PERMITTING THE PROSECUTION TO INTRODUCE EVIDENCE WHICH WAS NEVER DISCLOSED UNDER RULE 4.06?
After the jury was impaneled, defense counsel moved the court to issue an *Page 343 
order prohibiting the State from calling Rico Cabello as a witness on the ground that Rico's name "was not submitted to the defendant according to the rules of discovery . . . until this morning at 10:27 . . ." After an off-the-record argument, the court stated:
 Well, it does muddy up the water . . . however, in view of the history of this case and these charges, this witness having testified . . . against his brother about two weeks ago, now we are talking about him testifying against his father; evidently it would not be a complete shock to anyone and Mr. Odom[1]
the court will require this witness be brought to you wherever you want him brought to today and give you an opportunity to talk to him if you wish to do so. We will order the sheriff to transport him to any room in the building you request for that purpose.
The court's procedure meets the guidelines set out in the specially concurring opinion complementing the majority opinion in Box v. State, 437 So.2d 19, 22-26) (Miss. 1983), decided after the present case was tried. The first guideline suggests, "the court's initial response should be a directive that the defense be given a reasonable opportunity to interview the newly discovered witness, . . ." 437 So.2d at 23. Here, the defense was given such an opportunity.
The second guideline directs that if the defendant, after having interviewed the would-be witness, feels he has been subjected to unfair surprise, it is incumbent upon the defendant to request a continuance. The record reveals Frank, Sr. made no such request, which would have been in order although the case was tried prior to Box.
Additionally, defense counsel had notice that Rico had testified against Frank, Jr., his brother, and in the normal flow of legal events would be expected to testify against his father as to the facts arising out of the same robbery/homicide. Moreover, the trial court properly averted any prejudice to Frank, Sr. by offering him an opportunity to question Rico outside the presence of the jury prior to his being called as a witness. Therefore, we conclude that no prejudice arose out of the failure to formally notify the defendant that his son was a prospective witness for the state, and that this assignment is meritless.
 X.
DID THE COURT ERR IN DENYING FRANK, SR.'S MOTION FOR STATE FUNDED EXPERT ASSISTANCE?
The court overruled Frank, Sr.'s pre-trial motion for funds "to hire an investigator trained in criminal work to aid defendant's counsel in the preparation of his defense."
In Bullock v. State, 391 So.2d 601, 607 (Miss. 1981), we held the trial court committed no error in refusing to grant defendant's motion for appointment of a criminologist or criminal investigator where the motion "did not outline any specific costs for such an investigator, and did not indicate to the court in any specific terms as to the purpose and value of such an individual to the defense." Likewise, in this case there is no indication in the record of the purpose and value of an investigator to Frank, Sr.'s defense. Further, there is no contention that the state's expert witnesses were not impartial and independent. Therefore, we are of the opinion proposition X is of no help to appellant.
 XI.
DID THE COURT ERR IN DENYING FRANK, SR.'S REQUEST FOR CONTINUANCE DUE TO THE UNAVAILABILITY OF A DEFENSE FINGERPRINT EXPERT?
Frank, Sr. contends the court's refusal to grant his motion for continuance violated Mississippi Code Annotated, § 99-15-29
(1972). That statute provides in part,
 On all applications for a continuance the party shall set forth in his affidavit *Page 344 
the facts which he expects to prove by his absent witness or documents that the court may judge of the materiality of such facts, . . . that he has used due diligence to procure the absent documents, or presence of the absent witness, . . . stating in what such diligence consists, and that the continuance is not sought for delay only, but that justice may be done. The court may grant or deny a continuance, in its discretion, and may of its own motion cross-examine the party making the affidavit. (Emphasis added.)
It is also stated that "A denial of the continuance shall not be ground for reversal unless the supreme court shall be satisfied that injustice resulted therefrom."
The court concluded that the fingerprint expert would testify that Gurley's prints, and no one else's, had been found at the scene of the crime. In the court's opinion the value of this evidence did not warrant a continuance. We agree and uphold the court's ruling.
 XII.
DID THE COURT ERR IN ALLOWING INTO EVIDENCE THE FRUITS OF THE SEARCH OF FRANK, SR.'S CAR IN CALIFORNIA?
At trial defense counsel argued the California search warrant was illegal in that it was based on information obtained from an allegedly illegal search of the car in New Braunfels, Texas.
Officer Womack of New Braunfels Police Department testified Rico and Frank, Jr. were arrested at a motel in New Braunfels on a charge of theft of service from an innkeeper. The orange Mustang, having been "used by the offenders in the theft of service to arrive at that motel," was impounded and inventoried according to the police department's administrative policy. This type procedure was upheld in South Dakota v. Opperman,428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and in Jackson v.State, 440 So.2d 307 (Miss. 1983). Therefore, we are of the opinion the New Braunfels' inventory search was legal and information obtained therefrom did not render the subsequent California search illegal.
Frank, Sr. now attacks the California search on the additional ground that the affidavit in support of the warrant contains material misstatements of fact in reckless disregard of the truth. Having examined the affidavit and the testimony pertinent to it, we conclude this contention is not supported by the evidence.
Our opinion is this assignment is meritless.
 XIII.
DID THE COURT ERR IN ADMITTING BECKY SETTLEMIRES' IDENTIFICATION TESTIMONY?
Ramada Inn maid Becky Settlemires observed Frank, Sr. on Tuesday and Wednesday, December 22 and 23. On Friday, December 25, she described Frank, Sr. to Officer Burns. The following week Burns showed Settlemires a polaroid photograph which she identified as depicting the man she had seen in the motel room on December 22 and 23. We observe the purpose of this procedure was to aid officers in their search for the perpetrators of the robbery/homicide. Frank, Sr. now argues that Settlemires was shown only one photograph which was, by its isolation, unduly suggestive and tainted her in-court identification of him.
The major issue in a case of this sort is the avoidance of "a very substantial likelihood of irreparable misidentification."Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). The factors to be considered "in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the *Page 345 
confrontation." 409 U.S. at 199, 93 S.Ct. at 382.
Application of these factors to the facts of this case renders the following observations:
(1) Settlemires was in the motel room for 25 to 30 minutes with Frank, Sr. where he engaged her in brief conversation. She also saw and recognized him the next day.
(2) It is difficult to determine Settlemires' level of attention; however, she spoke with Frank, Sr. and noticed that he needed a shave.
(3) On Friday, December 25, Settlemires gave Officer Burns a description of Frank, Sr. from which a composite drawing was rendered.
(4) Settlemires' in-court identification of Frank, Sr. was unequivocal.
(5) Ten (10) days elapsed between the time Settlemires observed Frank, Sr. in the motel room and the photographic identification, which was prior to Frank, Sr.'s arrest. Moreover, Settlemires accurately described Frank, Sr. to Officer Burns one week prior to the photographic identification.
We conclude the record supports the court's determination that Settlemires' in-court identification had not been tainted by undue suggestion and there was no substantial likelihood of irreparable misidentification. Therefore, we conclude proposition XIII is without merit.
 XIV.
DID THE COURT ERR IN REFUSING TO POSTPONE DEATH QUALIFICATION OF THE JURY UNTIL AFTER THE GUILT PHASE?
After the voir dire and out of the presence of the prospective jurors, defense counsel objected "to jurors being systematically excluded just because they don't believe in the death penalty." The defense contended Frank, Sr. was entitled to a jury representing a cross section of the community, including people opposed to the death penalty.
The court replied that jurors would not be excused for merely possessing conscientious scruples against the death penalty; however, jurors who could not vote for the death penalty under any circumstances would be excluded because the death penalty statute would be meaningless if such persons could not be disqualified.
The court's action is supported by Willie v. Maggio,737 F.2d 1372 (5th Cir. 1984), which held the exclusion from guilt phase juries persons who are unwilling to vote for capital punishment does not result in bias in favor of the prosecution on the issue of guilt or innocence, nor does it give rise to an unfair cross section of the community. 737 F.2d at 1385. Accord, Witherspoonv. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
We agree with this rationale and conclude proposition XIV is meritless.
Having reviewed in detail the record, the assignments of error, the briefs of counsel and oral argument, we are of the opinion the verdict of guilty should be affirmed.
 THE SENTENCE PHASE XV. DOES ENMUND BAR THE IMPOSITION OF THE DEATH SENTENCE IN THIS CASE?
Frank, Sr. contends the record does not show he either intended to kill Gurley or actually committed the acts which led to his death, and that reversal is therefore required under Enmund v.Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
The issue in Enmund was
 [W]hether the Eighth Amendment permits imposition of the death penalty on one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.
 458 U.S. at 797, 102 S.Ct. at 3376-77. *Page 346 
The court answered the question in the negative.
The appellant in Leatherwood raised an Enmund argument which the court rejected as follows:
 Enmund did not participate in the actual robbery nor was he present when the murder was committed — he was waiting in the getaway car. Michael Leatherwood, like Enmund, participated in the planning of the crime. The difference is that Leatherwood was also present and involved in the execution of the robbery/murder of Albert Taylor . . .
 . . . . .
 Though Leatherwood testified he never believed the robbery would be carried out and certainly never intended to kill the victim, this Court cannot believe that one who attempts to strangle his victim into submission to the point of unconsciousness and tells his accomplice to "stab him" does not intend to or attempt to kill. The appellant's actions spoke louder than his words.
 Though Michael Leatherwood was not the "trigger man", he planned, schemed, and ultimately physically subdued the victim by choking him with a rope, while another stabbed and bludgeoned the victim to death. These are hardly the facts upon which Enmund was decided by the United States Supreme Court and thus we find that the appellant's argument is not persuasive . . .
 435 So.2d at 656.
We are of the same opinion here. The facts now before us are distinguishable from those upon which Enmund was decided. Specifically, we think unbelievable, in view of the evidence, the premise that sixteen-year-old Frank, Jr. single-handedly bound, gagged and strangled the adult male victim, while Frank, Sr. stood by and neither killed, attempted to kill, nor intended a killing or that lethal force would be employed to insure the robbery's success. Rather, the alternative inference is logical: that Cabello, the father and family leader, was the dominant party in the crime. We are of the opinion the Enmund shield does not extend to protect this defendant as revealed by the evidence.
 XVI. DID THE STATE'S CLOSING ARGUMENT RENDER THE PENALTY PHASE FUNDAMENTALLY UNFAIR?
In addressing this issue we have held considerable latitude must be given counsel in the argument of cases. Craft v. State,271 So.2d 735, 737 (Miss. 1973). However, there are limits to this latitude. Specifically in death penalty cases, the state is prohibited from arguing elements such as the possibility of parole, Williams v. State, 445 So.2d 798 at 812-14 (Miss. 1984), or of reversal through appellate review, Wiley v. State,449 So.2d 756, 761-63 (Miss. 1984). Obviously there are other unmentioned restrictions, such as arguing facts not in evidence, which to avoid prolixity we do not dwell upon.
Having reviewed the prosecutor's closing argument in the context of the evidence, we conclude the state took great liberty but did not exceed its limits. As we stated in Neal v. State,451 So.2d 743, 762 (Miss. 1984), "The defendant is entitled to broad latitude in framing his final argument to the jury . . . (citations omitted) Likewise the prosecuting attorney is entitled to a comparable latitude, so long as he or she does not argue some impermissible factor."
No impermissible factor was argued here, in our opinion. Observing additionally that defense counsel did not bring the alleged errors to the attention of the court, we hold this proposition meritless.
 XVII.
DID THE COURT ERR IN ALLOWING THE JURY TO CONSIDER AGGRAVATING CIRCUMSTANCE (5)(b) WHERE THE PROSECUTION DID NOT DISCLOSE THE CONVICTION UNTIL AFTER THE TRIAL HAD STARTED?
Outside the presence of the jury defense counsel moved the court to prohibit *Page 347 
the state from introducing evidence of a prior conviction for armed robbery on the ground "that the defendant was not provided with discovery on any prior convictions until this morning at 9:40 a.m." However, the defense had previously been informed the state had Frank, Sr.'s rap sheet which listed several charges. The assistant district attorney had informed defense counsel the state would obtain certified copies of convictions of as many of the charges as possible and would notify defense counsel as soon as these were received. The assistant district attorney stated he received a copy of the armed robbery conviction on the morning of trial and gave defense counsel a copy at that time.
The court was of the opinion "that the discovery procedure is for the purpose of giving the defendant notice of what is going to be presented against him. It is not incumbent to furnish him the actual evidence but it is to tell him what the evidence is going to be." We are of the opinion the court's ruling was proper in view of the surrounding circumstances. Defense counsel had a copy of the rap sheet and had been informed the state would be engaged in an ongoing effort to obtain a record of defendant's previous convictions. We are of the opinion this notice was sufficient and this assignment is without worth.
 XVIII.
WAS THE EVIDENCE IN SUPPORT OF AGGRAVATING CIRCUMSTANCE (5)(b) CONSTITUTIONALLY UNRELIABLE, PREJUDICIAL AND INSUFFICIENT TO PERMIT THE JURY TO CONSIDER ITS APPLICABILITY?
During the sentencing phase Investigator Burns testified he questioned Frank, Sr. on February 16, 1983, at the Corinth Police Department. After having executed a waiver of rights, Frank, Sr. stated his date of birth was June 23, 1923, and that he had previously used the name James Kenna. Kenna was the name of his adoptive parents.
Frank, Sr. first argues the introduction of this statement violated his right to counsel. However, we find nothing in the record to suggest the statement was made without an intelligent waiver of Cabello's Miranda rights.
The state next introduced copies of a bill of information and of court minutes showing one James Kenna with the birth date of June 23, 1923, had been convicted of armed robbery on January 5, 1955. Officer Burns also testified he asked the defendant when he had changed his name from Kenna to Cabello and had received an indefinite answer.
In our opinion the evidence was sufficiently identified to warrant the submission of aggravating circumstance (5)(b), prior conviction of another capital offense or of a felony involving use or threat of violence to the person, to the jury.[2]
Frank, Sr. further complains about the admission of the "mug shot" from the Louisiana State Penitentiary. The photograph is attached to a document of certification from the Louisiana Department of Corrections and clearly shows the words "La. State Pen.," the number 44845, and the date January 16, 1958.
The use of mug shots at trial is generally prohibited on the basis that evidence of other crimes perpetrated by the accused is not admissible. Sloane v. State, 437 So.2d 16, 18 (Miss. 1983). However, this principle loses significance in the sentencing phase of a capital case, when "A prior conviction `of another capital offense or of a felony involving the use or threat of violence to the person' is admissible . . . as an aggravating circumstance to be considered by the jury in determining punishment." Gray v. State, 351 So.2d 1342, 1345 (Miss. 1977).
In this case the objective of the admission of the photograph was to prove Frank, Sr. had been convicted of the prior offense *Page 348 
under the name James Kenna. Thus the conviction itself was not something to be withheld from the jury as it would have been in a trial on the issue of guilt. We are of the opinion there was no error in the admission of the photograph.
 XIX. WERE SENTENCING INSTRUCTIONS S-1 AND S-2 IMPROPERLY GRANTED?
Sentencing instruction S-1 set out the four possible elements of aggravation and advised the jury that to return the death penalty they must "find that any aggravating circumstances — those which tend to warrant the death penalty — outweigh the mitigating circumstances — those which tend to warrant the less severe penalty."
We find no error in this instruction. Although Frank, Sr. complains S-1 did not define the aggravating circumstances, we note the defense offered no instruction purporting to define them; nor was any objection interposed to S-1. In Williams v.State, 445 So.2d at 807, we held, "[N]o assignment of error involving the giving of an instruction to the jury will be considered on appeal unless a specific objection to the instruction was made in the court below. Miss.Sup.Ct. Rule 42."
We observe additionally that the language of S-1 follows Mississippi Code Annotated, §§ 99-19-101 and 99-19-103 (Supp. 1984). We are of the opinion, stated simply, that had Frank, Sr. objected to this instruction, the objection would have been properly overruled.
Secondly, Frank, Sr. argues sentencing instruction S-2 impermissibly favored a sentence of death by instructing the jury foreman concerning the completion of verdict forms only if a death sentence were imposed. We first observe defense counsel expressly waived any objection to S-2. Additionally, we find no error in this instruction which adheres to Mississippi Code Annotated, § 99-19-103 (Supp. 1984).
We are of the opinion the court committed no error in granting instructions S-1 and S-2.
 XX. DID THE COURT ERR IN REFUSING TO INSTRUCT THE JURY ON ITS LIFE OPTION?
Frank, Sr. argues the trial court erred in failing to inform the jury of its authority to return a life sentence even where aggravating circumstances outweighed mitigating circumstances. InBilliot v. State, 454 So.2d 445, 466 (Miss. 1984), we stated:
 This same argument was presented to us in Hill v. State, 432 So.2d 427 (Miss. 1983), where the Court noted that the jury had found certain aggravating circumstances to outweigh the mitigating circumstances, and in rejecting Hill's arguments stated,
 The jury in this case, just as the jury in Jordan
[v. State, 365 So.2d 1198 (Miss. 1978)], unanimously found that the aggravating circumstances outweighed the mitigating circumstances and that the death penalty should be imposed. Their verdict is set out in language which shows that they had come to the conclusion that the aggravating circumstances justified the death penalty's imposition and not that they had no other choice but to impose it. Based upon our holding in Jordan, we find no reversible error in the lower court's refusal to grant instruction D-2.
 . . . . .
 This jury came to the conclusion that the aggravating circumstances justified the death penalty and they did not conclude that they had no other choice but to impose it. . . .
We are presented with the identical situation in this case. Therefore we are of the opinion the court committed no error in refusing the life option instruction. *Page 349 
 XXI. DID SENTENCING PHASE INSTRUCTIONS SHIFT THE BURDEN OF PROOF TO THE DEFENDANT?
Frank, Sr. contends the penalty phase instructions previously discussed required him to persuade the jury that mitigating circumstances outweighed aggravating circumstances. We rejected identical arguments in Wilcher v. State, 448 So.2d 927, 939-40 (Miss. 1984), and Hill v. State, 432 So.2d 427, 442 (Miss. 1983). Likewise we are of the opinion Frank, Sr.'s proposition is unavailing here.
 XXII.
DID EXPERT TESTIMONY AT THE PENALTY PHASE IMPROPERLY USURP THE ROLE OF THE JURY?
During the sentencing phase Dr. McLees testified as to the pain associated with the manner in which Gurley died. The trial court overruled defense counsel's objection that McLees was "talking about emotions" about which he was not qualified to discuss.
We are of the opinion McLees' testimony was relevant to the issue of pain suffered by the victim, which was a crucial element of aggravating circumstance (5)(h): Whether the killing was especially heinous, atrocious or cruel. We observe further that McLees testified only as to medical facts, the pain involved in death by strangulation or suffocation, and not as to conclusions of law, whether the killing was especially heinous, atrocious or cruel. The latter determination was left for the jury. For these reasons we are of the opinion the court did not err in permitting McLees' testimony on this issue.
 XXIII. WAS THE EVIDENCE SUFFICIENT TO SUPPORT THE CHARGED AGGRAVATING CIRCUMSTANCES?
We discuss individually the evidence of three of the four aggravating circumstances, omitting the circumstance of previous conviction of a crime of violence, which was examined under proposition XVIII.
1. Whether or not the murder was committed while the defendant was engaged in the commission of robbery and was committed for pecuniary gain, Mississippi Code Annotated, § 99-19-101(5)(d), (f): Evidence supporting this circumstance was set out in the statement of facts of this opinion: e.g., the open safe door, the absence of money on Gurley's premises, and Frank, Sr.'s asking his older son for "the money" as the Cabellos were leaving Corinth.
2. Whether the murder was committed in an especially heinous, atrocious or cruel manner, § 99-19-101(5)(h): Dr. McLees testified in part that
 This is the most painful way to die that I know of that you can die, short of burning to death . . . you are conscious, you are struggling. He obviously was struggling, he had cuts all over his hands, scrape marks where he was trying to get the tape off and the larnyx had been crushed. I suppose that what makes it so horrible to me is that it takes a period of time, three to five minutes before you lose consciousness.
Dr. McLees also testified that before losing consciousness a person who is being suffocated or strangled would experience "horror." Additionally, there would have been "excruciating" pain associated with Gurley's crushed larnyx.
3. Whether the murder was committed for the purpose of avoiding or preventing the detection and lawful arrest of the defendant, §99-19-101(5)(e): The record reveals Frank, Sr. cursed Rico, his young son, for having told Gurley where the Cabellos were staying. Thereafter Frank, Sr. attempted to remove fingerprints from the motel room. At this time the Cabellos' belongings were packed into the Mustang. These facts along with other circumstances of the crime in our opinion support a reasonable inference that "a substantial reason for the killing was to conceal *Page 350 
the identity of the killer or killers or to `cover their tracks' so as to avoid apprehension and eventual arrest . . ."Leatherwood v. State, 435 So.2d at 651. Therefore the submission of this aggravating circumstance to the jury was proper.
Based on these facts our opinion is the aggravating circumstances enumerated in Instruction S-1 were properly submitted to the jury.
 XXIV.
DID THE STATE'S RELIANCE ON THE ROBBERY UNDERLYING A CAPITAL FELONY MURDER CONVICTION TO ESTABLISH MULTIPLE AGGRAVATING CIRCUMSTANCES IRRATIONALLY SKEW THE PENALTY PROCEEDING AND INCREASE THE LIKELIHOOD THAT FRANK, SR. WOULD BE SENTENCED TO DEATH?
Frank, Sr. now contends the use of both robbery and pecuniary gain as elements of an aggravating circumstance increased the likelihood that he would be sentenced to death and should not have been allowed. This argument has been roundly rejected by this Court. Irving v. State, 441 So.2d 846, 849 (Miss. 1983);Tokman v. State, 435 So.2d 664, 669 (Miss. 1983). We therefore hold this assignment of error is without merit.
 XXV.
DID THE TRIAL COURT IMPROPERLY DENY FRANK, SR.'S MOTION FOR REBUTTAL ARGUMENT DURING THE PENALTY PHASE?
Frank, Sr. asserts this denial was improper because the burden of proof shifts during the penalty phase to the accused to persuade the jury that mitigating circumstances outweigh aggravating circumstances. This premise is without basis in the law. Stated simply, the defendant is not required to prove anything at the sentencing phase. Jordan v. State,365 So.2d 1198, 1206 (Miss. 1978); Gray v. State, 351 So.2d 1342, 1346 (Miss. 1977). Shouldering no burden of proof, the defendant likewise has no right to rebuttal argument in our jurisprudence.
There is no merit in this proposition.
 XXVI.
IS THE SENTENCE OF DEATH DISPROPORTIONATE GIVEN THE CIRCUMSTANCES OF THE OFFENSE AND THE OFFENDER?
Having compared this case with our other decisions upholding the death penalty since Jackson v. State, 337 So.2d 1242 (Miss. 1976), we are of the opinion the death penalty for Frank, Sr. is not wanton, freakish, or disproportionate to the sentence imposed in other similar cases.[3] We reach this conclusion mindful of the offense and the defendant as compared with those in other cases. Particularly we observe this Court has recently affirmed several convictions and death sentences where the defendant was found guilty of robbery/murder, as was Frank, Sr. E.g. Dufour v.State, 453 So.2d 337 (Miss. 1984); Stringer v. State,454 So.2d 468 (Miss. 1984); Booker v. State, 449 So.2d 209 (Miss. 1984); Caldwell v. State, 443 So.2d 806 (Miss. 1983).
In conclusion we are of the opinion none of the appellant's assignments of error have merit, and the conviction and sentence must be affirmed.
AFFIRMED AND JUNE 12, 1985, FIXED AS THE DATE FOR EXECUTION OF THE SENTENCE AND INFLICTION OF THE DEATH PENALTY IN THE MANNER PRESCRIBED BY LAW.
WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
ROBERTSON and SULLIVAN, JJ., specially concur.
HAWKINS, J. dissents. *Page 351 
 APPENDIX "A"
DEATH CASES AFFIRMED BY THIS COURT:
 Billiot v. State, 454 So.2d 445 (Miss. 1984)
 Dufour v. State, 453 So.2d 337 (Miss. 1984)
 Stringer v. State, 454 So.2d 468 (Miss. 1984)
 Wilcher v. State, 455 So.2d 727 (Miss. 1984)
 Wilcher v. State, 448 So.2d 927 (Miss. 1984)
 Neal v. State, 451 So.2d 743 (Miss. 1984)
 Booker v. State, 449 So.2d 209 (Miss. 1984)
 Caldwell v. State, 443 So.2d 806 (Miss. 1983)
 Irving v. State, 441 So.2d 846 (Miss. 1983)
 Tokman v. State, 435 So.2d 664 (Miss. 1983)
 Leatherwood v. State, 435 So.2d 645 (Miss. 1983)
 Hill v. State, 432 So.2d 427 (Miss. 1983)
 Pruett v. State, 432 So.2d 1101 (Miss. 1983)
 Gilliard v. State, 428 So.2d 576 (Miss. 1983)
 Evans v. State, 422 So.2d 737 (Miss. 1982)
 King v. State, 421 So.2d 1009 (Miss. 1982)
 Wheat v. State, 420 So.2d 229 (Miss. 1982)
 Smith v. State, 419 So.2d 563 (Miss. 1982)
 Edwards v. State, 413 So.2d 1007 (Miss. 1982)
 Johnson v. State, 416 So.2d 383 (Miss. 1982)
 Bullock v. State, 391 So.2d 601 (Miss. 1980)
 Reddix v. State, 381 So.2d 999 (Miss. 1980)
 Jones v. State, 381 So.2d 983 (Miss. 1980)
 Culberson v. State, 379 So.2d 499 (Miss. 1979)
 Gray v. State, 375 So.2d 994 (Miss. 1979)
 Jordan v. State, 365 So.2d 1198 (Miss. 1978)
 Voyles v. State, 362 So.2d 1236 (Miss. 1978)
 Irving v. State, 361 So.2d 1360 (Miss. 1978)
 Washington v. State, 361 So.2d 61 (Miss. 1978)
 Bell v. State, 360 So.2d 1206 (Miss. 1978)
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FORRESENTENCING TO LIFE IMPRISONMENT:
 Edwards v. State, 441 So.2d 84 (Miss. 1983)
 Dycus v. State, 440 So.2d 246 (Miss. 1983)
 Coleman v. State, 378 So.2d 640 (Miss. 1979)
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEWTRIAL ON SENTENCING PHASE ONLY:
 Mhoon v. State, 464 So.2d 77 (Miss. 1985)
 Cannaday v. State, 455 So.2d 713 (Miss. 1984)
 Wiley v. State, 449 So.2d 756 (Miss. 1984)
 Williams v. State, 445 So.2d 798 (Miss. 1984)
[1] Mr. Odom served as defense counsel in that case as well as this one.
[2] Mississippi Code Annotated, § 99-19-101(5)(b) (Supp. 1984).
[3] See Appendix "A".