500 So.2d 928 (1986)
Jimmy Michael STRINGER
v.
STATE of Mississippi.
No. 55607.
Supreme Court of Mississippi.
September 3, 1986.
Rehearing Denied February 4, 1987.
*930 Harry L. Kelley, Florence, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Amy D. Whitten, Sp. Asst. Atty. Gen., and Marvin L. White, Jr., Asst. Atty. Gen., Jackson, for appellee.
En Banc.
DAN M. LEE, Justice for the Court:
On June 21, 1982, James Michael (Jimbo) Stringer, his father, James Stringer, Sr., John Mack Parker, Rhonda Brock, and Michael Medders entered the South Jackson home of Ray and Nell McWilliams, intending to rob and kill the couple. Ray McWilliams unexpectedly put up a fight; in the ensuing scuffle, McWilliams was shot and killed. Almost simultaneously, Jimbo Stringer put a shotgun to the back of Nell McWilliams' head, as she attempted to crawl away, and pulled the trigger. The blast tore away the top of Mrs. McWilliams' head, killing her instantly.
Jimbo Stringer was previously convicted of the capital murder of Nell McWilliams and was sentenced to life imprisonment. This appeal stems from his conviction of the capital murder of Ray McWilliams, for which he received the death penalty. We affirm his conviction, but reverse and remand only his sentence of death in this bifurcated proceeding.
We are loathe to reverse this sentence, for the ruthlessness and brutality of this crime cry out for the severest punishment permitted by law. Despite our reluctance to reverse, we are duty bound and sworn by oath to uphold the laws of the State of Mississippi. We are thus entrusted with the responsibility of ensuring that the criminal justice system of this state works to guarantee that every defendant brought before its tribunals receives a fair and impartial trial. To that end, we must instill in all officers of the trial courts a sense of their own responsibility in preserving our system of justice. To avoid abuse of that system, we admonish all prosecutors, trial judges, and other affected officials to follow the rules and provide a fundamentally fair hearing at the sentencing (death penalty) phase, or be prepared to "do it again."
We give the jury in a capital murder case the awesome responsibility to determine sentencing. The jury should deliberate on the death penalty in the same atmosphere of fairness and impartiality in which it would consider the verdict of guilt or innocence, taking into account only whether the statutory aggravating factors outweigh any mitigating circumstances. We have the ultimate faith that the jury will do exactly that, if it is not improperly influenced. However, when the jury imposes a penalty of death on the basis of passion, prejudice, or matters extraneous to the issue before it, that penalty must be reversed because of the improper influence.
We vacate and remand the death penalty in this case because the prosecution improperly influenced the jury during the sentencing phase. The attorneys for the state committed no single error egregious enough, standing alone, to mandate reversal. However, the combination of argument and trial tactics by the prosecutors was sufficient to inflame and prejudice the jury in its deliberation on the death penalty. Specifically, the errors that we hold to merit reversal are:
1) The introduction into evidence of photographs of the body of Nell McWilliams. (Note that Jimbo Stringer was previously convicted of the murder of Nell McWilliams. Stringer v. State, 491 So.2d 837 (Miss. 1986). This appeal stems from his trial for the murder of Ray McWilliams.)
2) The display to the jury, during closing argument, of color slides of the body of Nell McWilliams.
3) The state's attempt to prevent Stringer from calling John Mack Parker as a witness.
4) The prosecutor's questioning during voir dire, to get a commitment from the jury to exclude certain mitigating factors from its consideration of the death penalty and his subsequent reminder to the jury of that promise, under oath, during closing argument.

*931 5) The "last chance" argument, to influence the jury to return the death penalty for the killing of Mrs. McWilliams.
6) The prosecution's comment on Stringer's failure to testify.
The heightened review which we give to death penalty cases requires us to consider the cumulative impact of all of these factors. We hold that their aggregate effect was to deny the defendant below a fundamentally fair trial on whether he should suffer the death penalty.
Our system of jurisprudence is the best yet developed by mankind to try and punish criminal offenders. However, in order for it to work, all officers of the courts must recognize and carry out their responsibility to ensure a fair and complete trial for every criminal defendant and the state. That responsibility is not based upon some abstract principle, but evolves from our responsibility as public officials. We all owe a duty to the taxpayers of this state to give criminal defendants a full and complete trial the first time around. When this Court reverses and remands a case for a new trial, it not only diminishes public confidence in our system of justice, it also creates the additional expense of trying the defendant again. Far too many cases, like this one, are reversed for errors in prosecutorial conduct which are not difficult to anticipate or correct. It is with this in mind that we instruct on the law, so as not to encounter in the future the frustration of reversing cases because of errors which we have warned against before.
We would urge trial judges, prosecutors, and defense attorneys to read and carefully consider this opinion. Our solemn duty is to guarantee a fundamentally fair trial to the state of Mississippi and all criminal defendants. We intend to abide by our duty, which will be made easier if all adhere to the spirit of the following language:
The fair way is the safe way, and the safe way is the best way, in every criminal prosecution. The history of criminal jurisprudence and practice demonstrates generally that if every one prosecuted for crime were fairly and fully conceded all to which he is entitled, and if all doubtful advantages to the state were declined, and if adventurous forays into dangerous and unknown fields were shunned, and if the beaten paths were heedfully followed, there would be secured as many convictions of the guilty, and such convictions would be succeeded by few or no reversals.
Hill v. State, 72 Miss. 527, 534-5, 17 So. 375, 377 (1895).
On November 28, 1983, Jimbo was tried for the murder of Mr. Ray McWilliams. He was convicted of that murder and received the death penalty on December 1, 1983. He now appeals that conviction, and assigns eighteen (18) errors to the court below, which will be dealt with separately in this opinion.

STATEMENT OF FACTS
On June 21, 1982, Ray and Nell McWilliams were found shot to death in their south Jackson home. McWilliams was in the business of buying gold and silver jewelry. James Stringer, who was in the same business, was questioned about the case on June 22, 1982; however, no arrests were made until after July 2, 1982. On that date, Rhonda Brock made a statement to the Kosciusko police regarding the case. That statement implicated Jimbo Stringer, James Stringer, Sr., and Brock's then traveling companion, Mike Medders, in the murder. After Jackson police who were investigating the murders realized that Brock's statement was inconsistent with the physical evidence, she was again questioned, on July 3, 1982. At that time she was placed in custody and gave another statement which was consistent with physical evidence and implicated her former lover, John Mack Parker. Mike Medders was also arrested, and he subsequently gave a statement to the police. Both Brock and Medders were originally charged with capital murder; however, the state agreed to accept guilty pleas to manslaughter in return for their cooperation in testifying against the other participants in the crime.
*932 Brock and Medders testified at Jimbo's trial, and, while their stories disagreed in some small details, they were essentially the same. According to them, Brock, Medders, James Stringer, and John Mack Parker met on June 21, 1982, at the apartment of James Stringer's girlfriend. The purpose of the meeting was to plan the robbery and murder of the McWilliamses. James Stringer knew that Ray McWilliams kept a safe in his house with sums of money and jewelry in it. The plan was to tie up the McWilliamses, get the combination to the safe, and then murder the couple. During this planning, James Stringer called his son, Jimbo, and asked him to bring some bullets over. Jimbo later arrived with the bullets and a shotgun. When he arrived, his father asked him if he would like to come along with them, and he agreed.
Later that evening, the five drove to the McWilliamses' home. As they had planned, Rhonda Brock gained entry to the home by posing as a potential seller of gold and silver. Ray McWilliams admitted her into his house; James Stringer entered it with her. Stringer and McWilliams began to struggle, and a shot went off during that time. Then Parker, Jimbo, and Medders entered the home. Jimbo went further into the house with his shotgun, pointed it at the floor and shot. Parker told Mr. McWilliams "You are a dead man," and, after that, another shot went off. As they were leaving the house, Mr. Stringer asked Jimbo if Mrs. McWilliams was dead, and he said that she was. The robbery plan was aborted because apparently someone noticed that McWilliams' neighbor, whom they knew to be a policeman, was coming across the backyard to investigate the shots. The five jumped back into their car and fled the scene.
According to testimony from the pathologist, Mr. McWilliams died from a wound to his face, and his other wounds were consistent with a struggle over a gun. According to Dr. Galvez, his death came very quickly. Mrs. McWilliams was killed by a shotgun blast to the back of her head. Apparently she was in a crawling or crouching position at the time she was shot, and the top of her head was blown off by the shotgun blast.
Jimbo Stringer was found guilty of the capital murder of Ray McWilliams. During the sentencing phase, he presented evidence from several of his relatives, who testified to the influence which his father had over him. Relatives and neighbors testified that Jimbo was a model child, but that he was terrified of his father, and under his father's dominion and control.
The state introduced evidence of Jimbo's prior convictions of aggravated assault and capital murder. After the testimony regarding Jimbo's character, the state put on additional evidence of prior convictions, which were several convictions for various misdemeanors.
The jury sentenced Jimbo Stringer to death. In returning that sentence, the jury found the following aggravated circumstances: that the murder was committed while the defendant was engaged in an attempt to commit robbery, that it was committed for pecuniary gain, that it was committed for the purpose of avoiding or preventing the detection and arrest of Jimbo, his father, and others, and that the murder was especially cruel. The jury found that those circumstances outweighed any mitigating circumstances.

I. DID THE CAPITAL MURDER INSTRUCTION FAIL TO ADEQUATELY INFORM THE JURORS OF THE ELEMENTS OF THE CRIME?
Jimbo Stringer alleges that the court's instruction on capital murder failed to define the crime of attempted robbery, including the intent element. He also alleges that that defect was not cured by the court's instruction on aiding and abetting. However, no objection was made at trial to this instruction. Thus, any alleged error is barred on appeal. Gray v. State, 472 So.2d 409, 416 (Miss. 1985), cert. gr. Gray v. Mississippi, ___ U.S. ___, 106 S.Ct. 1182, 89 L.Ed.2d 299 (1986).

II. WAS THE INSTRUCTION ON AIDING AND ABETTING VAGUE, ERRONEOUS,

*933 AND OVERBROAD, AND DID IT VIOLATE THE BAN AGAINST DOUBLE JEOPARDY UNDER THE MISSISSIPPI AND UNITED STATES CONSTITUTIONS?
Stringer argues on this assignment that the instruction was not limited to the defendant's acts prior to the commission of the capital murder which actually contributed to it; therefore, the jury could have convicted him under this instruction on the killing of Mrs. McWilliams. When this instruction was proposed during the trial, counsel for the defendant did object to the instruction. He stated that it was vague and abstract, and asked that it be modified to specify that the acts alleged had to lead to the murder of Mr. McWilliams. The court agreed to the modification, and, after that, the instruction was accepted by the defense without objection. Thus, the very problem which the appellant alleges here was cured at trial. Furthermore, since the instruction was then accepted without objection, Stringer is procedurally barred by Gray from raising it as error on appeal.

III. DID THE LIMITED CROSS-EXAMINATION OF MICHAEL MEDDERS VIOLATE THE APPELLANT'S RIGHTS PURSUANT TO STATE LAW AND THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION?
During Medders' testimony, a discrepancy developed as to whether the robbery was actually planned on Sunday or Monday. In order to impeach Medders' testimony, counsel for the defendant attempted to get into evidence a statement which Medders had given to his attorney. At that point, Medders asserted his attorney-client privilege, in order to prevent introduction of the statement. Defense counsel then argued that the privilege had been waived, because Medders had given a statement to the police. The court allowed Medders to claim the privilege. On appeal, Stringer argues that this was error, because he was not allowed the opportunity to impeach Medders on his inconsistent statement. This assignment is without merit. The defense was attempting to impeach Medders on a collateral matter. In Williams v. State, 73 Miss. 820, 19 So. 826 (1896), this Court held that a witness may only be impeached on a statement which embodies "A fact substantive in its nature and relevant to the issue made in the case." 73 Miss. at 824, 19 So. at 827.
The question is whether Jimbo Stringer should have been allowed to prove that Medders had once said that the planning occurred on Sunday, rather than Monday, as part of his central case to prove his innocence. Clearly, the issue of whether the crime was planned on Sunday or Monday has no bearing on the guilt or innocence of Jimbo Stringer. Thus, the matter is collateral.

IV. WAS JIMBO STRINGER'S RIGHT TO A FAIR TRIAL DENIED BY THE ADMISSION OF PHOTOGRAPHS OF MRS. McWILLIAMS, WHICH WERE IRRELEVANT, PREJUDICIAL, AND INFLAMMATORY?
Over the objection of defense counsel, the state introduced pictures of Mrs. McWilliams. The initial introduction was of three photographs of Mrs. McWilliams' body, as it appeared at the scene of the murder. These were introduced during the testimony of L.E. Davis, of the Jackson police, who was the McWilliamses' neighbor, and discovered the bodies. The angle of the body in those photographs has the head pointed away from the camera, and, thus, does not fully show the extent of Mrs. McWilliams' wounds. Prior to the testimony of Dr. Galvez, the state introduced slides of Mrs. McWilliams' body. The two slides admitted appear to be essentially shot from the same angle as the photographs. Both the slides and the photographs, while not showing the extent of the wound to Mrs. McWilliams' head, do clearly show fragments of her skull and brain on the floor and on the wall.
During the closing argument for the state, at the guilt phase, the record indicates the following:

*934 But they left a witness. And who took care of that? There he sits. There he sits. And how did he do it?
(Mr. Davis changing slides)
There it is. It's not my handiwork. It's not anything you did. That's his handiwork. He had to go back to do it. And how did he do it? What did Dr. Galvez say? Down on her hands and knees probably trying to crawl behind a table to hide? She wasn't standing up. Why didn't he shoot her in the back while she was standing up? That's his handiwork  his handiwork. [emphasis added]
Again, during the closing argument in the sentencing phase, reference was made to the murder of Mrs. McWilliams. The record indicates that Mr. Davis turned the projector on during his argument. After discussing the appearance of Mr. McWilliams following the murder, Mr. Davis said the following:
And then we get to this defendant's handiwork. We get to what he did. Is there a drop of mitigation in that? Any fact or circumstance arising out of the case that you find to be mitigating. Do you find anything mitigating about that?
Clearly, then, the slides depicting the body of Mrs. McWilliams, as it appeared after the murders, were shown to the jury during closing argument for the state, both in the guilt phase and the sentencing phase. The state defends this presentation by stating that it portrayed Stringer's role as the "silencer." Counsel for the state urges that the photographs were necessary to prove the element of capital murder that Jimbo Stringer killed Mrs. McWilliams to prevent her from identifying the killers of Mr. McWilliams. Further, the state would argue that it was within the trial court's discretion to admit the photographs and slides.
It has long been the position of this Court that photographs of bodies may be admitted into evidence where they have probative value, and where they are not so gruesome as to be overly prejudicial and inflammatory. Johnson v. State, 476 So.2d 1195, 1206 (Miss. 1985); Cabello v. State, 471 So.2d 332 (Miss. 1985).
The pictures of Mrs. McWilliams are not overly gruesome. The question in this case is primarily only of relevance  were the photographs of Mrs. McWilliams' body necessary to establish the guilt of Jimbo Stringer in the murder of Mr. McWilliams? Certainly, the state, in order to connect Jimbo with the murder of Mr. McWilliams, had to show that he participated in the murder in some way. The testimony showed that Stringer was not the "trigger man" in the murder of Mr. McWilliams, nor was he involved in the struggle. The state's position was that his primary involvement in the crime was as the "silencer" of Mrs. McWilliams. However, Jimbo's role could have been established without the admission of the photographs.
The photographs of Mrs. McWilliams were used in evidence during the testimony of the officer who found the bodies and during the testimony of the pathologist. However, slides of her body were also shown during closing argument in both the guilt phase and the sentencing phase. In West Virginia v. Clawson, 165 W. Va. 588, 270 S.E.2d 659 (1980), the court found that the trial judge had abused his discretion in allowing the admission of gruesome photographs of two murder victims. In determining whether the admission of the photographs was harmless error, the court noted that the photographs had been used during closing argument. The court held that this precluded the error from being harmless, since where such photographs are shown to the jury during closing argument, "their impact on the jury is such that it will become so incensed and inflamed at the horrible conditions depicted that it will not be able to objectively decide the issue of the defendant's guilt." Id. 270 S.E.2d at 674.
While the introduction of these pictures, in itself, did not constitute reversible error, the pictures must have had a highly inflammatory effect on the jury. First, the pictures were part of an overall scheme to, in effect, try Jimbo Stringer for the murders *935 of both Ray McWilliams and Nell McWilliams. The prosecution introduced extensive evidence about both murders. During closing argument in the sentencing phase, the district attorney reminded the jury that Stringer did not receive the death penalty in his trial for the murder of Mrs. McWilliams, and emphasized that:
[T]his is my last chance. This is the state of Mississippi's last chance. This is the relatives of the McWilliams last chance for retribution.
Thus, the state used these photographs in an attempt to get a "second bite of the apple" in its quest for the death penalty for the murder of Nell McWilliams.
Second, the prosecution could not be content with merely introducing the photographs of Nell McWilliams into evidence, but displayed them to the jury during closing argument as part of its "slide show." We deplore this practice. As the West Virginia court noted in Clawson, the effect is to take the pictures far beyond their evidentiary value and use them as a tool to inflame the jury. While our death penalty statute mandates consideration of any factor which may mitigate against the sentence of death, it limits the aggravating circumstances which would warrant the imposition of the death penalty. It is the jury's duty to weigh the permissible aggravating circumstances against any mitigating factors to determine whether the defendant deserves to suffer the death penalty. Just as a lack of evidence taints this process, so does the admission of irrelevant or inflammatory evidence. Color slides of the body of another victim, projected on a screen during closing argument, are an unnecessary dramatic effect that can only be intended to inflame and prejudice the jury. A sentence of death returned after such an unnecessary and gruesome display must be suspect. We hold that this tactic, combined with others, so prejudiced the jury that Jimbo Stringer did not receive a fair sentencing trial.

V. WAS THE INTRODUCTION OF COPIES OF THE PLEA BARGAINING AGREEMENTS WITH THE COINDICTEES AND THE STATE'S CLOSING ARGUMENT VOUCHING FOR THEIR CREDIBILITY VIOLATIVE OF THE APPELLANT'S RIGHT TO CONFRONT WITNESSES AGAINST HIM, AND DID IT DENY HIM DUE PROCESS AND FUNDAMENTAL FAIRNESS?
After Rhonda Brock testified as to her version of the events which occurred on June 21, 1982, she was extensively cross-examined. The cross-examination covered her relationship with Parker and Medders, her prior employment with an escort service in New Orleans, the inconsistencies between the first and second statements which she made, her prior testimony in the case, and whether she had been arrested and indicted since the crime. During redirect, when counsel for the state began to question Brock about the agreement she had with the state, counsel for the defendant objected. With the exception of deleting a reference in the agreement to a polygraph test, the court overruled the objection, and allowed admission of the agreement. Mike Medders' statement was admitted into evidence during his direct examination.
During closing argument, Mr. Davis, counsel for the state, stated that Medders and Brock had testified truthfully. The objection to that statement was overruled, on the basis that Medders and Brock had testified that their statements were true. Mr. Davis went on to point out to the jury that the court reporter was taking down everything that Medders and Brock said. Later, during Mr. Peters' closing argument, he made the following statement:
If you had the entire Jackson police department to determine whether or not you were lying, if you had the entire district attorney's office to determine whether you were lying, and the best you can do is  as one of them says, they were going to use the bandana to wipe off the finger prints and the other one doesn't, and the best you can do is they were five feet into the house instead of a foot inside the door, then would you believe that person? When legal minds, *936 when courts, when police, when investigators had not been able to find you in a lie, then would you believe that person?
The appellant argues that this was improper vouching, making the prosecutor a witness against him. The state argues that counsel for the appellant failed to object at trial; however, the record shows that the attorney made an objection to the reference in closing argument that Medders and Brock were testifying truthfully, and later interposed a continuing objection on that ground. Thus, the assigned error was preserved for appeal.
In Cabello v. State, 471 So.2d 332 (Miss. 1985), this Court allowed admission of the agreement to remand the defendant's son's case to the youth court. One of the factors allowing disclosure was that "Defense counsel used the agreement to attack Rico's credibility on cross-examination. Thus the offer by the state and its acceptance by Rico, with its potential for truthfulness or falsehood in his testimony, was placed before the jury for their resolution." Id. at 341. In Cabello, the prosecutor informed the jury of the agreement before the direct testimony of the witness. During cross-examination, defense counsel used the agreement to attempt to impeach the witness's testimony. In this case, the jury was not informed of the agreement between Brock and the state until after her cross-examination. It was not brought out in cross-examination, thus, defense counsel could not have used it to impeach her testimony. At the end of Brock's cross-examination, defense counsel asked her "You have not been indicted, have you? A. No sir. Q., I guess you know who prosecutes, don't you, Miss Brock? A. Yes, sir." During redirect, counsel for the state noted that question and answer, and then asked Miss Brock about the agreement between her and the state.
This case does not fall squarely under Cabello, because defense counsel did not use the plea bargain agreement in his cross-examination. However, the agreement, as admitted into evidence, does not contain any improper vouching for the witness. It is merely evidence of an agreement between the witness and the state that she will testify truthfully, and, in the event that the state ascertains that she did not testify truthfully, she will be subject to prosecution for perjury. Given the fact that Miss Brock's credibility was attacked during cross-examination, introduction of the agreement showing that she had an incentive to testify truthfully was not improper. The introduction of Medder's statement may be viewed under the same rationale, since it was inevitable that his credibility would also be tested during cross-examination, as indeed it was.
The closing argument of the prosecutors comes much closer to improper vouching. In United States v. Roberts, 618 F.2d 530 (9th Cir.1980), the Court reversed a conviction where, during closing argument, the prosecutor said that a police officer was monitoring a government witness' testimony for truthfulness. The court held that "The suggestion is that the prosecutor is forcing the truth from his witness and the unspoken message is that the prosecutor knows what the truth is and is assuring its revelation. Conveying this message explicitly is improper vouching." Id. at 536. In this case, the prosecutors noted that the court reporter was taking down everything that was testified. They also noted that the entire police department and the district attorney's office was available to determine whether the witness was lying. However, the unspoken message in these arguments was not so much that the prosecutor knew what the truth was, but that, if the witnesses were caught in an inconsistency, the district attorney's office would investigate to see if they were lying. Thus, there was no improper vouching in this case.

VI. DID THE PROSECUTOR SYSTEMATICALLY AND INTENTIONALLY ENGAGE IN CONDUCT WHICH EFFECTIVELY DEPRIVED JIMBO STRINGER OF THE USE AT TRIAL OF THE TESTIMONY OF JOHN MACK PARKER, WHO WAS AN EYEWITNESS TO THE CRIME?
*937 Before trial, counsel for the defendant filed a writ of habeas corpus to produce John Mack Parker as a witness for Jimbo Stringer. The state answered that Parker's perjury conviction, which resulted from testimony that he gave during a prior trial, prevented him from testifying. The court held a hearing on the issue, where counsel for the defense argued that the perjury statute was unconstitutional as it applied to Jimbo Stringer, and that the indictment of perjury was void. The state argued that Stringer had no standing to assert those issues, since he was not convicted of perjury. The court took the matter under advisement. During the presentation of the defense's case, the court advised the attorneys that it would allow Parker to testify. Counsel for the defendant made the following response: "We talked about that and considered it for some three or four hours and finally came to the decision that we did not want to call him." Jimbo Stringer now argues that the failure to call Parker was induced by the perjury conviction, which rendered him unsuitable as a witness.
The right to examine Parker was not withheld by the court, but was precluded by the decision of the defendant's attorneys. Thus, Jimbo Stringer is procedurally barred from raising this issue on appeal. If that were not the case, this assigned error might well mandate the reversal of this case. The prosecution's maneuverings were obviously intended to prevent Stringer from exercising his fundamental right to call witnesses on his behalf. We hope that this situation will not arise in the future.

VII. WAS THE APPELLANT'S SENTENCE OF DEATH FOR THE KILLING OF RAY McWILLIAMS DISPROPORTIONATE CONSIDERING HIS MINOR ROLE IN THE CRIME AND THE OVERWHELMING MITIGATING CIRCUMSTANCES?
Miss. Code Ann. § 99-19-105 (Supp. 1985) requires this Court to review the imposition of the death penalty with regard to whether the sentence was proportionate to the penalty imposed in similar cases. The Court is required to consider both the crime and the defendant. Because we reverse the death penalty in this case on other grounds, it is not necessary to consider this assignment of error.

VIII. WAS THE SENTENCING HEARING FOR JIMMY STRINGER FOLLOWING HIS CONVICTION FOR THE MURDER OF MR. McWILLIAMS A VIOLATION OF THE DOUBLE JEOPARDY AND DUE PROCESS PROVISIONS OF THE MISSISSIPPI AND UNITED STATES CONSTITUTIONS?
After his conviction for the murder of Mrs. McWilliams, Jimbo Stringer received a sentence of life imprisonment, as the jury could not agree on a punishment. He now argues that that verdict precludes him from receiving the death sentence for the murder of Mr. McWilliams. According to Stringer, the verdict in the first case means that the jury did not find that the death penalty was appropriate for the killing of Mrs. McWilliams. He has assumed that the jury in the second case based its death penalty on the murder of Mrs. McWilliams, which was his primary participation in the murder of Mr. McWilliams. This assumption is based on the "rational jury test" of Ashe v. Swenson, 397 U.S. 436 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) and Sanders v. State, 429 So.2d 245 (Miss. 1983). He asserts that the finding of the first jury that the death sentence was not mandated for the killing of Mrs. McWilliams is a factual finding that may not be relitigated in his second trial. Thus, his claim is not so much under the double jeopardy provision as under a theory of collateral estoppel.
Where the jury does not impose the death penalty, it is not required to enumerate its factual findings. Therefore, a failure to unanimously agree on the punishment does not leave the defendant with any determination of fact upon which to base a claim of collateral estoppel. This situation is not the same as that which existed in the case of Arizona v. Rumsey, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984). In that case, the United States Supreme Court *938 held: "[R]espondent's initial sentence of life imprisonment was undoubtedly an acquittal on the merits of the central issue in the proceeding  whether death was appropriate punishment for respondent's offense." 467 U.S. at 211, 104 S.Ct. at 2310, 81 L.Ed.2d at 171. However, in that case, the trial judge, who was the sentencer, made a specific finding that there were no aggravating circumstances. Where such findings are not specifically made, a failure to impose the death penalty in one trial should not act as an acquittal on those issues in the second trial.

IX. DID THE CONDUCT OF THE PROSECUTORS DURING THEIR CLOSING ARGUMENTS AT THE SENTENCING PHASE OF THE TRIAL VIOLATE THE APPELLANT'S RIGHT TO A FUNDAMENTALLY FAIR TRIAL?
Stringer alleges that the closing argument during the sentencing phase was improper in three different places. First, he alleges that the prosecutor asked the jury to promise not to consider certain mitigating factors; second, he alleges that the prosecutor asked the jury to return the death penalty because the first jury did not; and, third, he alleges that the prosecutor told the jury to return the death penalty because Jimbo Stringer was a threat to society.

a. The request for a promise to return the death penalty.
During voir dire, the prosecutor asked the jurors if they could return the death penalty under the following conditions:
[H]ow many of those that have said that they are in favor of the death penalty and they could vote for the death penalty if he shot the other person  how many of those people could not vote for the death penalty if he didn't himself pull the trigger and killed [sic] the person he is charged with killing here?
Is there anyone that would base their decision on sympathy?
The prosecutor reminded the jury of those questions during his closing argument in the sentencing phase.
Each one of you said under oath  I can vote for the death penalty in the proper case. Will it matter that he's young? Will he have to have killed more than one person? Will he have to have pulled the trigger himself on this murder? Can you still do it? Can you do it based on the testimony of the two people that you convicted him on? And every single one of you said yes  on your oath  I can do that. If you hadn't you wouldn't be here.
If one of you  if one of you looks for an excuse and says  I'm not gonna vote for the death penalty and I'm not gonna give you a reason  just as Mr. Kelley said you can do  then you can keep from giving this person the death penalty. You can forget what you promised me. You can forget what you said under oath Monday. [emphasis added.]
It is reversible error to ask a juror during voir dire to commit to returning a particular verdict. West v. State, 485 So.2d 681 (Miss. 1985); Murphy v. State, 246 So.2d 920 (Miss. 1971). See also Rule 5.02, Mississippi Uniform Criminal Rules of Circuit Court Practice. The prosecutor in this case did not specifically request a verdict during voir dire; this conduct is not per se reversible; however, when accumulated with other factors, a different result is reached.
During closing argument, the district attorney characterized the jurors' negative responses to his voir dire as a promise, under oath, to return the death penalty in this case. When combined with the question regarding Stringer's involvement in the crime and the question about sympathy, the jurors could have had the mistaken impression that they had pledged to ignore the only mitigating factors which he could present in his defense. Those factors were his relatively minor role in the killing of Mr. McWilliams, and his unique personal characteristics which would invoke sympathy: his age, his high school record, his troubled home life, and the domination by his father. It is an improper influence to put the jury in a "box" by voir dire tactics *939 which extract a promise, prior to trial, to ignore evidence favorable to the defendant. This promise or pledge prevents the jurors from considering all factors relative to the verdict. The jurors are then called upon during closing argument to fulfill that promise, and the effect  whether calculated or not  is to shame or coerce the jury into rejecting factors which would tend to mitigate against the death penalty. We charge the jury in a capital murder case to narrow and distinguish the cases deserving of the death penalty from those which do not warrant such an extreme punishment. This awesome responsibility demands the freedom and flexibility to consider all relevant factors. A verdict returned on the basis of anything less cannot stand. When combined with other tactics used by the prosecution during the sentencing phase, we hold that the cumulative effect was to deny Jimbo Stringer a fundamentally fair trial at the penalty phase.

b. Comparison to first jury verdict.
Both of the attorneys for the state made reference to the fact that the jury in the murder of Mrs. McWilliams did not return the death penalty. Mr. Davis made the following statements:
He's been convicted of aggravated assault. He's been convicted of capital murder. I'm not trying to pull the wool over your eyes. The capital murder that he was convicted of was of Nell McWilliams. That's a circumstance that you can consider. I think you heard the lady read what happened. We, the jury, cannot agree upon the penalty.
Mr. Peters made the following remarks: This is our last chance. All it took  and I don't know how many there were  but all it took was one person last time to say I'm not gonna vote for the death penalty for any reason. And, God knows, I can't think why they would have done it. After blowing that woman's head off. And, as hard a pill as it was for us to swallow, we still had this case left. But this is it. Fortunately, the last time it happened we got another chance. And I have thought for all of these months  what in the world did I not say?
But, please forgive me, this is my last chance. This is the state of Mississippi's last chance. This is the relatives of the McWilliams last chance for retribution. [emphasis added]
These remarks were not, in themselves, reversible error. The question is whether the prosecutor's remarks denied Jimbo Stringer a fundamentally fair trial, with regard to his sentencing. United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). We hold that these remarks, combined with: the introduction of photographs of Mrs. McWilliams; the photographic slide display of Mrs. McWilliams' body during closing argument; the attempt to extract a pledge or promise during voir dire in violation of Circuit Court Rule 5.02, and the subsequent calling on the jurors to fulfill that promise; the attempt to prevent the defendant from producing John Mack Parker, the "trigger man," as a witness; and the veiled attempt to comment on the defendant's failure to testify, each of which, when standing alone, may not have required reversal, when accumulated, created such an atmosphere of bias, passion, and prejudice that they effectively denied Jimbo Stringer a fundamentally fair trial in the sentencing phase. United States v. Young; Williams v. State, 445 So.2d 798, 810 (Miss. 1984): Collins v. State, 408 So.2d 1376, 1380 (Miss. 1982).

c. Threat to society.
Finally, the appellant contends that the prosecutors improperly inferred that Stringer would be a danger to society if he did not receive the death penalty. Specifically, Mr. Peters made the following comments:
And, as bad as they are, don't the prisoners in the penitentiary have some rights? The prisoners that are up there for drugs, burglary, larceny, robbery, whatever they are up there for, don't they have the right not to have this guy in there with them? A cold blooded calculated *940 murderer? Don't they have some rights to safety too? As bad as they are, even though they shouldn't have committed whatever crime they committed, don't even they have a right not to be put in with somebody like this?
No contemporaneous objection was made to these remarks, and we find that they were not so inherently prejudicial as to deny Jimbo Stringer a fundamentally fair trial.

X. DID THE PROSECUTOR IMPROPERLY COMMENT ON JIMBO STRINGER'S EXERCISE OF HIS RIGHT NOT TO TESTIFY?
This alleged error was committed during the closing argument of Mr. Peters, during the guilt phase of the trial. He was discussing the decision by Mike Medders to invoke the attorney-client privilege to prevent a statement of his being admitted into evidence.
If he claims his right, it's not admissible in court. And what do they scream and holler about because he claimed his right? And listen to this instruction that's in here. The court instructs the jury that you must not consider the fact that the defendant did not even testify. Do they scream and holler about that right? Did he say one word about that? It's okay for some people to claim their rights but not Mike Medders. It's a two-edged sword. Everybody has got rights.
No contemporaneous objection was made to this line of argument. However, since the right involved is the right against self incrimination protected by the United States Constitution, we review the alleged error, in spite of the lack of objection. As we held in West v. State, 485 So.2d 681 (Miss. 1985), "It is the duty of the presiding judge, as well as trial attorneys on both sides, in the conduct of a criminal case to see that the constitutional rights of an accused are not violated. A defendant has a constitutional right not to take the witness stand." Id. at 687.
The first issue to be resolved under this assignment of error is whether the prosecutor's comments actually constituted an improper comment on the defendant's failure to testify. As this Court recognized in West, "Defense counsel did have a right ... to remind the jury of the court's instruction that no inference of any kind could be drawn from the defendant's failure to testify. This was simply stating the law... ." Id. at 688, n. 2. In this case, the prosecutor read the instruction to the jury that they could not consider the fact that the defendant did not testify. However, he went beyond merely reading the instruction. He then went on to compare the right of the defendant not to take the stand with the right of Mike Medders to invoke the attorney-client privilege.
The state argues that these comments were invited by the argument of defense counsel. Specifically, during his closing argument, counsel for the defendant said:
Oh, Mr. Medders is gonna tell you the truth all the truth, the whole truth. He has absolutely nothing to hide before this jury. And I ask him  I said  in August, did you give a statement to your lawyer in the Jackson city jail? And he said  I claim my privilege. Which he can do. I wonder why. We don't have to wonder why. He had a legal right to do it. He claimed his privilege. It's just a privilege. He could have told me about it. He could have told you all about it.
Even if the prosecutor's remarks were invited error, the United States Supreme Court, in United States v. Young, has held that the issue goes beyond the concept of invited error, and becomes whether the prosecutor's comments denied the appellant his right to a fundamentally fair trial.
There is a fine difference between insinuating that the defendant did not testify because he might be forced to incriminate himself, and simply comparing the defendant's right not to testify to the right of a witness to invoke the attorney-client privilege. The jury had already been informed that Stringer had the right not to testify, and that no unfavorable inference could be drawn from exercising that right. The prosecutor's argument simply pointed out to the jury that Mike Medders also had *941 a right to invoke the attorney-client privilege. In this case, the great weight of the evidence points toward the defendant's guilt. These actions are akin to skating on thin ice, and highly suspect; however, the prosecutor's remarks did not deny the appellant a fundamentally fair trial.

XI. DID THE INTRODUCTION OF EVIDENCE OF APPELLANT'S NONVIOLENT CRIMINAL CONVICTIONS AT THE SENTENCING PHASE VIOLATE HIS RIGHTS UNDER STATE LAW AND UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION?
During the sentencing phase of the trial, the state offered into evidence the convictions of Jimbo Stringer on capital murder and aggravated assault. They were received without objection by defense counsel.
However, prior to the sentencing trial, the state announced that it would attempt to introduce into evidence convictions of misdemeanors, contending that they were admissible because the defense would use as a mitigating circumstance the fact that the defendant had no prior criminal activity. Counsel for the defense assured the court that it would not use that as a mitigating circumstance. The court ruled that those convictions were inadmissible, because they were not relevant to an aggravating circumstance.
Later in the sentencing trial, the defendant put on a character witness who stated that she could not believe that Jimbo would commit any crime. However, she did state that her mind could be changed if she were shown proof of the convictions. At that point, the jury was excused, and counsel for the state moved the court to allow him to show the witness the evidence of Stringer's other convictions. He cited as precedent the case of Evans v. State, 422 So.2d 737 (Miss. 1982), cert. denied Evans v. Mississippi, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 314 (1983). In that case, this Court upheld the introduction of the defendant's prior nonviolent crimes in order to show that the capital murder he committed was committed by a person under sentence of imprisonment. Also in that case, the state was allowed to cross-examine the defendant's mother about his prior criminal record. On the basis of Evans, the court in this case permitted the state to cross-examine Stringer's character witness. During that cross-examination, and the later cross-examination of Stringer's sister, the state was allowed to go into some detail on the prior misdemeanor convictions. After that, the state was allowed to introduce evidence of two charges of carrying a concealed weapon. The state also introduced evidence of convictions of possession of marijuana, five counts of assault, and five counts of carrying a concealed weapon.
Stringer argues that the admission of these prior non-violent convictions was prohibited, since they were not relevant to any of the statutory aggravating factors. The state argues that they were relevant, under the rationale of Evans, in order to counter the testimony of the defendant's character witnesses that he was a good boy who would not be involved in crime if it were not for the influence of his father.
In the sentencing phase of the capital murder trial, the state is limited to offering evidence that is relevant to one of the aggravating circumstances included in § 99-19-101. Coleman v. State, 378 So.2d 640, 648 (Miss. 1979). However, the prior misdemeanor convictions were not introduced in evidence as an aggravating circumstance, but to impeach testimony regarding a mitigating circumstance, that the defendant had no prior significant criminal history. Thus, the introduction of the misdemeanor offenses was not error.

XII. DID THE EXCLUSION OF EVIDENCE OF THE SENTENCES OF THE CO-INDICTEES AT THE SENTENCING PHASE OF THE APPELLANT'S TRIAL VIOLATE HIS RIGHTS?
Prior to trial, the court ordered that the prior criminal records of the other defendants in this case could not be admitted into evidence. Prior to the sentencing phase of the trial, counsel for the defendant *942 moved to be allowed to tell the jury that Jimbo's father, James Stringer, had received the death penalty. The court overruled the motion.
While the defendant is given a wide latitude in offering mitigating evidence in a capital punishment case, it must be relevant to the question of whether he should suffer death. Jordan v. State, 464 So.2d 475 (Miss. 1985); Jackson v. State, 337 So.2d 1242 (Miss. 1976). However, courts are allowed to exclude, as irrelevant, "evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990, n. 12 (1978).
The issue here is whether the sentences of the coindictees were relevant to the issue of whether Jimbo Stringer should suffer death. If they were relevant, they must be considered. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). A similar question was presented in Johnson v. State, 477 So.2d 196 (Miss. 1985). There the defendant attempted to introduce evidence that his co-defendants had received life sentence verdicts by other juries. This Court held that evidence to be inadmissible. "Each case tried by a separate jury must stand on its own. Otherwise, the jury trial is pointless." Id. at 218. This assignment of error is without merit.

XIII. DID THE TRIAL COURT ERR BY ADMITTING INTO EVIDENCE COPIES OF COVER SHEETS OR PRIOR CONVICTIONS OF THE APPELLANT WHICH WERE NOT CERTIFIED COPIES OF THE COURT RECORD AND WHICH REVEALED DETAILS OF THE OFFENSES AND SENTENCES?
This assignment specifically covers the evidence of convictions in municipal court. They were tendered by Earnest Gladney, who was the municipal court administrator in Jackson and the custodian of the records of the City Court of Jackson. Prior to his testimony, counsel for the defense objected to the records of conviction because they were not docket entry records. The records show the report number, the docket number, the nature of the offense, information on the bond, a list of witnesses and attorneys, and disposition of the case.
This Court has held that "The best evidence of a previous conviction is the judgment of conviction." McGowan v. State, 269 So.2d 645, 649 (Miss. 1972). However, substitutes for the judgment of conviction have been allowed. In Vincent v. State, 200 Miss. 423, 27 So.2d 556 (1946), copies of docket entries of conviction were held to be sufficient, where they were certified by a justice of the peace. Similarly, in Lovelace v. State, 410 So.2d 876, 879 (Miss. 1982), abstracts of court records duly certified by a justice court judge were held to be sufficient. In Pace v. State, 407 So.2d 530 (Miss. 1981) original commitment papers were held to be sufficient to show a prior conviction.
Miss. Code Ann. § 13-1-77 (1972) allows admission of public records into evidence where they are certified by their custodian. These records were introduced at trial by their custodian, Mr. Gladney. Therefore, their introduction was not error.
The appellant also alleges that the state went into details of his convictions. Inquiry into the details of prior convictions is improper. Allison v. State, 274 So.2d 678 (Miss. 1973); Mangrum v. State, 232 So.2d 703 (Miss. 1970).
The record does not show that any details of the convictions were brought out in testimony. Gladney merely mentioned the nature of the offense charged, and the dates of the convictions. In Rowe v. State, 242 Miss. 499, 136 So.2d 220 (1962), this Court held that it was not error to give the number of the convictions and the nature of the offenses. Therefore, there is no error in this assignment.

XIV. WAS THE EXCUSAL FOR CAUSE OF SEVERAL JURORS WHO EXPRESSED QUALMS ABOUT THE DEATH PENALTY A VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH *943 AMENDMENTS OF THE UNITED STATES CONSTITUTION?
In Fuselier v. State, 468 So.2d 45 (Miss. 1985), this Court recognized a recent pronouncement on this issue from the United States Supreme Court in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Witt upheld the standard of Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and reiterated it, stating:
That standard is whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' ... This standard ... does not require that a juror's bias be proved with unmistakable clarity... . many veniremen simply cannot be asked enough questions to reach the point where their bias has been made `unmistakably clear.'...
Witt, 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851-52. In applying this standard, the Supreme Court held that "Deference must be paid to the trial judge who sees and hears the juror." Id. at 853. Where the trial judge's determination that a juror is biased is supported by the record, that determination will not be reversed.
Stringer wishes this Court to review the excusal of fourteen (14) jurors, whom he alleges expressed scruples to the death penalty: Oswalt, Moran, DeFoe, Eubanks, Johnson, Payne, Gooch, Bilbrew, Cox, Nicholson, Harris, Green, Fields, and Polk.
Of the fourteen (14) jurors which the appellant has challenged as being removed without cause, all but two (2) gave unequivocal answers that they were opposed to and could not vote for the death penalty. Jurors Oswalt and Moran seemed to equivocate somewhat. However, Oswalt eventually came to the conclusion that she could only vote for the death penalty if a member of her family were hurt or killed. Juror Moran initially stated that she was unequivocally opposed to the death penalty; however, she later stated that, under some circumstances, she could impose it. Under the holding of Fuselier, the excusal of Moran could have been reversible error. "Absent a clear showing that the prospective juror would be unable to follow the court's instructions and obey the juror's oath, that juror's feelings regarding the death penalty do not constitute grounds for a challenge and the granting of such a challenge is reversible error." 468 So.2d at 55. However, under the standard of Wainwright where a juror's position is not "unmistakably clear" the decision of whether or not to excuse the juror is left to the trial judge's discretion.
An examination of the record reveals that Moran was excused for other reasons. When the state challenged Moran, the defense attorney objected, on the grounds that she stated she could vote for the death penalty under certain circumstances. The court made the following statement: "There's a weak possibility that she stated and the objection will be sustained." Mr. Peters then stated: "I further challenge that juror your honor based upon the fact that just after the jury broke prior to the jury selection, she was in the jury room with the defendant and either she or Miss Oswalt handed the defendant a cup of coffee and they exchanged some minor conversation. I don't know what it was." The trial judge then replied: "Alright. Let's move on to the next one." That is the last mention of Miss Moran in the record, until she is listed in the group of jurors who was to be excused.
There was no constitutional violation in the excusal of jurors for cause because of their scruples against the death penalty. Cf. Lockhart v. McCree, ___ U.S. ___, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

XV. WAS THE APPELLANT SENTENCED TO DIE UNDER INSTRUCTIONS THAT UNCONSTITUTIONALLY SHIFTED THE BURDEN OF PROOF TO THE DEFENSE AND THAT FAILED TO INFORM THE JURY OF ITS DISCRETION TO EXERCISE MERCY?
The appellant objects to sentence instruction No. 13, which states that the jury "Must find that the mitigating circumstances *944  those which tend to warrant the less severe penalty, life imprisonment  do not outweigh the aggravating circumstances  those which tend to warrant the death penalty." He argues that the instruction impermissibly shifts the burden of proof to the defendant to show that the mitigating circumstances outweigh the aggravating circumstances, rather than the reverse. The record shows that, at the time the instruction was proposed, there was no objection on this portion of the instruction by counsel for the defense. Counsel for the defense did submit Instruction No. 8, which stated that the state had the burden of showing that the aggravating circumstances warranted death. That instruction was refused without argument from the defense. Thus, the appellant is procedurally barred from raising this issue on appeal. Barnette v. State, 478 So.2d 800 (Miss. 1985).
Even if Stringer could assert this as error on appeal, the assignment lacks merit. The language of the instruction, that the mitigating circumstances must be found to outweigh the aggravating circumstances, tracks the language of the statute. Section 99-19-101(3)(c) requires the jury to find "That there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances." In Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982), cert. denied 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983), the appellant sought to show that the statute impermissibly shifted the burden of proof to the defendant. The court ruled that it did not, saying that "The Mississippi Supreme Court has construed its capital punishment statute to place the burden of proving any aggravating circumstances on the prosecution. See Gray v. State, 351 So.2d 1342, 1345, supra. This is the critical burden since the jury's failure to find an aggravating circumstance precludes it from imposing the death penalty." Id. at 1107. This Court addressed that issue, in an assignment of error worded exactly the same as the one now before the Court, in Jordan v. State, 464 So.2d 475 (Miss. 1985), where, relying on Gray v. Lucas, we held that this issue lacks merit.

XVI. COULD THE AGGRAVATING CIRCUMSTANCES FOUND BY THE JURY CONSTITUTIONALLY SUPPORT JIMMY STRINGER'S DEATH SENTENCE?
The aggravating circumstances found by the jury were: that the defendant contemplated that life would be taken, that the capital murder was intentionally committed and the defendant shared in that intent, that the murder was committed while the defendant was engaged in an attempt to commit robbery, that the murder was committed for pecuniary gain, that the murder was committed for the purpose of avoiding or preventing arrest, and that the murder was especially cruel.
The appellant argues that the jury was not informed that it could consider only the killing of Ray McWilliams in finding aggravating circumstances. He also argues that there was nothing to show that the murder of Ray McWilliams was especially cruel.
In Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the United States Supreme Court reversed a death penalty given to a man who shot his wife and mother-in-law. The evidence showed that he shot his wife through a window of a trailer, then entered the trailer and shot his mother-in-law. The court noted that the victims were killed instantly, that they were family members with whom the defendant had had conflict, and that the defendant immediately acknowledged the killings after he had done them. Thus, the court reasoned that the defendant had not shown a consciousness "Materially more depraved than that of any person guilty of murder." 446 U.S. at 433, 100 S.Ct. at 1767, 64 L.Ed.2d at 409. The state argues that the fact that Ray McWilliams was forced to fight for his life, and fight for the life of his wife, raises this crime to being particularly cruel. However, regardless of whether the evidence substantiates that finding, the jury's death penalty was predicated on several aggravating circumstances. *945 In Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the court held that, where a death penalty is supported by several aggravating circumstances, the invalidity of one of those circumstances will not constitutionally impair the sentence.

XVII. DID THE TRIAL COURT'S FAILURE TO INFORM THE JURY THAT, IF THEY WERE UNABLE TO AGREE WITHIN A REASONABLE TIME ON THE PUNISHMENT TO BE IMPOSED, JIMBO STRINGER WOULD BE SENTENCED TO LIFE IMPRISONMENT, VIOLATE HIS RIGHTS?
Again, the record shows no objection made to the instruction offered by the court, which did not include the language now offered by the appellant; it also does not show that the appellant ever proffered such an instruction to the court. Thus, based on Barnette v. State, 478 So.2d 800 (Miss. 1985), the appellant should be precluded from appealing this as error.
However, even if the appellant is allowed to proceed with this assignment, it is foreclosed by King v. State, 421 So.2d 1009 (Miss. 1982):
The argument creates an illusion of prejudice, which has no logical basis. If the jurors were unable to unanimously find that the aggravating circumstances were sufficient to impose the death penalty and that there were insufficient mitigating circumstances to outweigh the aggravating circumstances, then they could not return a death sentence. Further, in the event they could not unanimously agree after a reasonable period of deliberation, it would be the trial judge's duty under Miss. Code Ann. § 99-19-103 to dismiss the jury and impose a sentence of life imprisonment on the defendant.
Id. at 1018.

XVIII. DID THE STATE'S INTRODUCTION OF A SHOTGUN AND SHOTGUN CASE, BOTH OF WHICH WERE SEIZED PURSUANT TO A SEARCH WARRANT ISSUED WITHOUT PROBABLE CAUSE, VIOLATE THE APPELLANT'S RIGHTS UNDER ARTICLE 3, SECTION 23 OF THE MISSISSIPPI CONSTITUTION?
Of course, this error was one of the reasons for reversing Jimbo's conviction for the murder of Mrs. McWilliams. The issue in this case is whether the appellant waived his right to assert this error on appeal.
The following proceedings were had outside the presence of the jury:
BY THE COURT:
Do you want to question the validity of the search warrant?
BY MR. KELLY:
Yes sir, I would like to. I would like to see it.
BY MR. PETERS:
We want him to first your Honor tell us how he is gonna tie these items in that have been marked for identification and particularly the gun case without it being brought in that it was recovered from his apartment. If he brings it out, he has waived his right to the search warrant for the first part because he said he is gonna put it in evidence, he's gonna tie it in and he has given the court the assurance of that and he waives any problem with the search warrant.
... .
BY MR. KELLY:
I'm trying to think of any other way that I can tie it in if I question the search, your honor... . I'm gonna have to make a decision. Could I have just a minute?
BY THE COURT:
Yes sir.
BY MR. KELLY:
We will withdraw our objection if that's all they intend to show was found in the apartment.
The appellant, in his brief, concedes that he did not object at trial to the search and seizure of the shotgun. However, his rationale is that, since the case was being tried before the same judge as heard the previous case, there was no point in making the objection, since the ruling would not change.
*946 The appellant attempts to characterize his withdrawal of objection over the shotguns as the same situation which existed in Jones v. State, 461 So.2d 686 (Miss. 1984). In that case, a confession was erroneously admitted and the defendant testified to the same facts. This Court held that that testimony did not waive his rights as to the confession.
When the trial judge makes a ruling adverse to a litigant, and where the litigant's lawyer has properly noted his objection, that litigant and his lawyer are entitled to try the rest of the case on the assumption that the trial judge's ruling will not be disturbed on appeal. And, when that litigant reaches this Court we will not imply a waiver from the subsequent conduct which does nothing more than show the lawyer's obligatory respect for the trial judge while at the same time continuing as best can be done the advancement of his client's cause.
Stong v. Freeman Truck Line, Inc., 456 So.2d 698, 711 (Miss. 1984), cited in Jones v. State, 461 So.2d at 702.
If the guns had been previously introduced into evidence, over the defendant's objection, in this trial, and the defendant simply used them in his own testimony, this assignment of error would have more strength. However, here the defendant was doing more than making the best of a bad situation. He had affirmatively presented the evidence to advance his own case. The appellant here "in effect, ... waived the ground of objection here assigned and chose to experiment with the evidence to see if it would help or hurt him." Stringer v. State, 279 So.2d 156, 159 (Miss. 1973). He did effectively waive any right to assert this error on appeal.

CONCLUSION
In summary, we hold that no reversible error was committed during the trial on Jimbo Stringer's guilt, and we thereby affirm his conviction. However, we also find that Jimbo Stringer did not receive the fundamentally fair sentencing hearing required by state law because of the admission of the photographs of Mrs. McWilliams' body, the "slide show" during closing argument, the attempt to prevent Parker from testifying, the improper voir dire, the "last chance" argument, bordering on double jeopardy, and the comment on Stringer's failure to testify. In effect, the photographs, the slides, and the "last chance" argument allowed the jury to sentence Stringer to death for the killing of Mrs., not Mr., McWilliams. The improper voir dire and the accompanying closing argument told the jury to ignore the only factors Stringer could present in mitigation of the death penalty. The failure of Parker to testify prevented the jury from hearing from the real "trigger man" in this murder. The comment on Stringer's failure to testify was simply the last item in a series of "near-errors" which effectively killed any chance that Stringer could receive a fundamentally fair sentencing trial, as guaranteed by the laws of the state of Mississippi. As custodians of those laws, and of the judicial system which upholds them, we cannot allow this death penalty verdict to stand.
AFFIRMED AS TO GUILT: DEATH SENTENCE VACATED AND REMANDED.
As to guilt phase: WALKER, C.J., ROY NOBLE LEE, P.J., PRATHER, ANDERSON and GRIFFIN, JJ., concur.
HAWKINS, P.J., and ROBERTSON and SULLIVAN, JJ., dissent.
As to sentencing phase: HAWKINS, P.J., PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
ROY NOBLE LEE, P.J., WALKER, C.J., and GRIFFIN, J. dissent.
ANDERSON, J., dissents by separate opinion.
ROY NOBLE LEE, Presiding Justice, dissenting:
I would affirm the judgment imposing the death penalty upon the appellant. *947 Therefore, I dissent from the majority opinion.
The appellant has assigned eighteen (18) errors in the trial below. The majority opinion discusses each of those assignments and concludes, half-heartedly, that only one, Assignment IV, rises to the height of reversible error. Yet, the opinion refers to seven (7) instances in the record which it categorizes as "near errors" and opines that, from a totality of the record, appellant did not receive a fundamentally-fair sentencing trial as guaranteed by the laws of the State of Mississippi.
There never has been a perfect trial. As long as humans conduct and participate in the trial of lawsuits, there will not be such a trial. This Court has said many times that a defendant is not entitled to a perfect trial, only a fair trial. Sand v. State, 467 So.2d 907 (Miss. 1985); Bell v. State, 443 So.2d 16 (Miss. 1984); Palmer v. State, 427 So.2d 111 (Miss. 1983); and Shaw v. State, 378 So.2d 631 (Miss. 1979).
The record reflects one of the most atrocious murders in the annals of Mississippi criminal jurisprudence. The appellant and others went to the home of the McWilliams, husband and wife, with the intent to rob them of their valuable jewelry and, in order to accomplish their purpose, to take the lives of those people. Appellant brought ammunition to the rendezvous, entered the McWilliams' home with his accomplices, and either killed, or participated in killing, both McWilliams. The evidence of appellant's guilt is overwhelming. The penalty for such murders is death. I think that appellant's guilt was proved beyond reasonable doubt. Therefore, I would affirm the judgment of the lower court.
However, since the case is being reversed for a new trial in the sentencing phase, I suggest that the trial court submit to the jury the Enmund standard, viz, that the jury determine in its verdict whether or not appellant killed, attempted to kill, intended that a killing take place, or contemplated the use of lethal force against McWilliams. Miss. Code Ann. § 99-19-101(7)(a-d) (Supp. 1985); Cabana v. Bullock, 474 U.S. ___, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed. 1140 (1982).
WALKER, C.J., and GRIFFIN, J., join this opinion.
ROBERTSON, Justice, concurring in part, dissenting in part:

I.
Jimbo Stringer ("Jimbo") assigns as error admission of photographs of the body of Nell McWilliams at the guilt phase of his trial for the capital murder of Ray McWilliams. Stringer argues that this evidence was irrelevant, prejudicial and inflammatory and that, accordingly, his conviction and sentence should be reversed. The majority opinion, as I understand it, considers the admission of these photographs as error but not necessarily reversible error. Instead, the majority accumulates the admissions of these photographs with other factors and even then reverses on sentence only. I consider that the trial judge has committed enormously prejudicial error on a rather straightforward point of evidence, which should mandate reversal of Stringer's conviction and sentence and remand the entire case for a new trial.
The photographs of the body of Nell McWilliams open our view to a wider universe. From slides made of these photographs, the pathologist, Dr. Rodrigo Galvez, was allowed to testify extensively and to give his complete autopsy report regarding the death of Mrs. McWilliams. This substantial, detailed evidence regarding the murder of Nell McWilliams was neither relevant nor necessary in any legal sense to the question of whether Jimbo was legally responsible for the capital murder of Ray McWilliams.
The charge in the indictment furnishes the cornerstone for all trial determinations of evidentiary relevancy in a criminal prosecution. It is hornbook law that, to be relevant, evidence must appear calculated to alter the probabilities of some fact of *948 consequence in the action.[1]Mississippi State Highway Commission v. Dixie Contractors, Inc., 375 So.2d 1202, 1205 (Miss. 1979). The issues in this case were whether Jimbo Stringer was an accessory before the fact of the murder of Ray McWilliams during an attempt to commit the crime of robbery. Miss. Code Ann. §§ 97-1-3 and 97-3-19(2)(e) (Supp. 1985).
Conceding that the trial judge has broad discretion regarding the admission of evidence in any trial, that discretion has limits. Those limits here are ascertained by reference, first, to relevancy and, second, to a weighing of probative value against harmful effect.[2] Our concern should be whether the photographs of the body of Nell McWilliams and the autopsy testimony of Dr. Galvez and all of the rest of the State's evidence regarding the death of Mrs. McWilliams reasonably appears calculated to alter the probabilities of some fact of consequence in the prosecution of Jimbo Stringer for the capital murder of Ray McWilliams. To my mind the answer inescapably is, "No". If the photographs (and the other substantial detailed evidence of the Nell McWilliams murder) are irrelevant to an issue of fact, they have by definition no probative value and we never reach the question of prejudice.
The error in the admission of this evidence regarding the murder of Nell McWilliams is given reversible proportions by additional facts in the case. Those facts, in a nutshell, are that Jimbo Stringer without contradiction shot and killed Nell McWilliams, while he did not lay so much as a finger on Ray McWilliams, his legal culpability being only as an accessory if at all. Miss. Code Ann. § 97-1-3 (1972). The factual setting suggests that we regard these erroneously admitted photographs as presumptively prejudicial and hence presumptively reversible. Killingsworth v. State, 374 So.2d 221, 223 (Miss. 1979); McDonald v. State, 285 So.2d 177, 179 (Miss. 1973); Overstreet v. State, 369 So.2d 275, 277 (Miss. 1979). Jimbo's participation in the murder of Ray McWilliams was so slight, and in that of Nell McWilliams so great, that portrayal of the gory details of the Nell McWilliams murder simply may not rationally be said to have had no harmful effect. Overstreet v. State, supra, 369 So.2d at 277; Tudor v. State, 299 So.2d 682, 685-86 (Miss. 1974).
No resort per se to the gruesome nature of the photographs is made. Consistent with our many prior cases on the subject, these photographs are not so gruesome that we would hold as a matter of law that there prejudicial effect outweighed their probative value, if they had been used in the trial of Jimbo Stringer for the murder of Nell McWilliams. These photographs were wholly admissible at Jimbo's first trial that where he was charged with the murder of Nell McWilliams.[3] It is on relevancy grounds that the use of these photographs in the trial of Jimbo Stringer for the capital murder of Ray McWilliams is error.

II.
The State's sole hope, in my view, for saving the conviction on this point is the argument that the murder of Nell McWilliams was substantially interrelated with the facts and circumstances of the murder of Ray McWilliams and that evidence that Jimbo Stringer killed Nell McWilliams was admissible as a part of the res gestae. Leaving aside the fact that our cases have bastardized the common law res gestae exception to the hearsay rule, e.g., Lee v. State, 244 Miss. 813, 821, 146 So.2d 736, *949 739 (1962), it is certainly true that we have on many occasions approved the consideration of evidence of other crimes substantially interrelated with that charged in the indictment. Brooks v. State, 242 So.2d 865, 869 (Miss. 1971). The other crimes evidence offered here, however, is qualitatively and quantitatively in excess of any we have seen in any other similar case. An explanation is appropriate.
It all began in opening statement when the prosecuting attorney announced that the State intended to prove that "Mrs. McWilliams was killed from a blast of a shotgun". It blew her head off in the kitchen." Sergeant L.E. Davis of the Jackson Police Department described the location of the body of Nell McWilliams and then identified the three photographs which showed remnants of Nell McWilliams' brain on the floor and nearby wall. The State then elicited from accomplice, Rhonda Brock, Jimbo's statement that "he had shot her head off".
Thereafter, the State offered, in connection with the testimony of the pathologist, Dr. Rodrigo Galvez, enlarged slides projected upon a screen depicting Nell McWilliams' body. Defense counsel at that point correctly articulated the premise of this opinion: that upon the trial of Jimbo Stringer for the capital murder of Ray McWilliams, "the fact of this lady being shot with her brains all over the floor can only prejudice this jury and inflame the minds of the jury and has no probative value". The slides were nevertheless received into evidence and projected before the jury whereupon Dr. Galvez gave testimony regarding the autopsy he performed on Nell McWilliams, sample statements from which testimony include
The more important finding was the top of the head  the top of the head was completely blown off by a shotgun blast and the brain was completely torn out and there were only a few fragments of brain left inside the cranial cavity.
That [State's Exhibit 25 projected on a screen] is the body of Nellie McWilliams and it shows part of the skull or cranial bones that were blown off by the shotgun blast. Also, fragments of brain tissue is stuck in the wall and here there are some fragments of brain and bones that turn the trajectory of the shotgun blast and the direction it went and how the blast hit the woman... . The projectile came from the back of the head to the front of the head.
The State outdid itself when it had Dr. Galvez testify that Nell McWilliams' fatal wounds were
consistent with [her] being on the hands and knees or crawling or trying to crouch herself behind a table trying to look for protection or seek protection.
Lest it be forgotten, Jimbo Stringer was on trial for the capital murder of Ray McWilliams.
Officer Richard Barnes, a crime lab investigator for the Jackson Police Department, told the story of Mrs. McWilliams again by reference to the photographs and slides. Homicide Detective Robert Jordan did likewise. Michael James Medders, another of the accomplices who was cooperating with the State as part of his plea-bargain agreement, reiterated that John Mack Parker, not Jimbo Stringer, had shot Ray McWilliams, but that Jimbo had killed Nell McWilliams.
In final argument to the jury at the guilt phase the prosecuting attorneys repeatedly exhorted the jury to consider that Jimbo had killed Nell McWilliams. Typical was the display of the slide photograph of the body of Nell McWilliams, coupled with these concluding words:
There it is. It's not my handiwork. It's not anything you did. That's his handiwork. He had to go back to do it. And how did he do it? What did Dr. Galvez say? Down on her hands and knees probably trying to crawl behind a table to hide? She wasn't standing up. Why didn't he shoot her in the back while she was standing up? That's his handiwork  his handiwork.
Like I said, if you are in for a penny, you are in for a pound. I think you know in your hearts that he is guilty. *950 And I think that's the way you will find him.
The point, I trust, is by now clear.

III.
The general rule in this state, enunciated in a variety of contexts, has heretofore been that the issue on a criminal trial should be single and that the evidence should be limited to what is relevant to the single issue. Brown v. State, 483 So.2d 328, 330 (Miss. 1986); Stinson v. State, 443 So.2d 869, 873-74 (Miss. 1983); Crafton v. State, 200 Miss. 10, 14, 26 So.2d 347, 348 (1946). Evidence of other criminal activity on the part of an accused is inadmissible where the prior offense has not resulted in a conviction. Tobias v. State, 472 So.2d 398, 400 (Miss. 1985); Donald v. State, 472 So.2d 370, 372 (Miss. 1985); Hughes v. State, 470 So.2d 1046, 1048 (Miss. 1985); Tucker v. State, 403 So.2d 1274, 1275 (Miss. 1981); Eubanks v. State, 419 So.2d 1330 (Miss. 1982).
Where the prior offense has resulted in a conviction, evidence thereof is ordinarily admissible for impeachment purposes only. Washington v. State, 478 So.2d 1028, 1033 (Miss. 1985); Johnson v. State, 452 So.2d 850, 854 (Miss. 1984). The fact of the conviction is all that the party attacking the credibility of the witness is allowed to show. No facts and circumstances may be shown except by way of explanation by the party whose credibility is attacked. Gallion v. State, 469 So.2d 1247, 1249 (Miss. 1985). It has never been thought that prior convictions in this manner were admissible on grounds that they were evidence relevant to the matter of whether the accused was guilty of the offense charged in the indictment.
The reasons for the general rule have been often stated. Eighty-eight years ago, in Herman v. State, 75 Miss. 340, 22 So. 873 (1898) we stated:
This rule is founded in reason, for we allow the introduction of evidence of other and distinct offenses would confuse and mislead the jury as to the real issue to be determined, would prejudice the prisoner by irrelevant matter, and would require him to meet charges foreign to the specific offense laid to his charge.
75 Miss. at 345, 22 So. at 873. This statement has been approved in May v. State, 199 So.2d 635, 641 (1967).
More recently, a court unanimous on this issue gave as the rationale of the rule
that evidence of other crimes may tend to prejudice the minds of the jurors or confuse them as to the real issues on trial.
Caldwell v. State, 443 So.2d 806, 810 (Miss. 1983), reversed on other grounds; 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
We have made it clear that we will reverse where the jury was presented evidence
of other crimes and immorality [which] destroyed the possibility of a fair trial upon the charge in the indictment... .
Sumrall v. State, 272 So.2d 917, 919 (Miss. 1973).
The detailed evidence of the murder of Nell McWilliams when the accused is on trial for the murder of Ray McWilliams, precisely the sort of evidence the rule does, and was intended to, exclude. Despite the fact that Jimbo Stringer played at best a modest role in the murder of Ray McWilliams, the State was allowed to charge its case under the instant indictment with proof  massive proof  that Jimbo brutally murdered Nell McWilliams. This under our law the prosecution simply may not do. Tucker v. State, 403 So.2d at 1275; Crafton v. State, 200 Miss. 10, 14, 26 So.2d 347, 348 (1946).
Notwithstanding these considerations, the State invokes our well established exception to the single issue rule in cases where the offense charged and those offered to be proved are so connected so as to constitute one transaction, where it is necessary to identify the defendant, to prove motive and where there is an apparent relation or connection between the act proposed to be proved and that charged, or where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary *951 to prove scienter or guilty knowledge. See, e.g., Blair v. State, 445 So.2d 1373, 1375 (Miss. 1984).
I urge no retreat from these exceptions to our general rule nor from our holdings that the State has a legitimate interest in telling a rational and coherent story of what happened. Turner v. State, 478 So.2d 300, 301 (Miss. 1985); Neal v. State, 451 So.2d 743, 759 (Miss. 1984). Where substantially necessary to present to the jury the complete story of the crime, evidence or testimony may be given even though it may reveal or suggest other crimes. Brown v. State, 483 So.2d 328, 330 (Miss. 1986). These holdings are made necessary by the danger that, otherwise, testimony by the State's witnesses too carefully manicured might lead alert jurors to the thought that something of importance was being withheld. Such suspicions on the part of jurors could lead to mischievous miscarriages of justice.
What must be kept in mind is that this exception to the general rule contemplates evidence that it is "necessary" for the State to adduce in order to make out its case or tell a coherent story. For example, Lockett v. State, 459 So.2d 246 (Miss. 1984) allows evidence of other crimes where such is "necessary to identify the defendant" or "necessary to prove scienter or guilty knowledge". 459 So.2d at 253. [Emphasis added] We do not believe the State would seriously argue that in order to prove the elements of the capital murder of Ray McWilliams it was necessary to offer photographs of the body of Nell McWilliams, nor to present a pathologist's testimony regarding the autopsy findings regarding her death, nor his speculations that the victim was on her knees, crawling, when she was shot down.
The State's attorney on appeal struggles valiantly with a hopeless record made below. Realizing that loss of credibility before the Court would attend an argument that the gory details of Nell McWilliams' murder were relevant to the charge that Jimbo Stringer murdered Ray McWilliams, the State's brief seeks solace in Jimbo's role in the foiled robbery attempt. Jimbo is described as "a `silencer' of any potential interference which might hamper a successful robbery or impede an escape".
The argument fails to advance the State's position beyond what it must be conceded to be: that, as an incident to its telling the jury the story of Jimbo's "entanglement" in the "tenacled crime" of the capital murder of Ray McWilliams, the State's witnesses could without objection include the fact that Jimbo shot and killed Nell McWilliams. But that in no way authorized presentation to this jury the photographs, the projected slides, the autopsy findings, the gruesome details of a murder for which Jimbo was not then on trial. The State cites no case contrary to this view for the almost certain reason that none can be found.
At the risk of repetition and to the end that I not be misunderstood, I would not hold inadmissible any reference to the killing of Nell McWilliams or of Jimbo Stringer's participation in it. Such evidence falls within the exception to the general rule. Neal v. State, 451 So.2d 743, 759 (Miss. 1984); Carter v. State, 450 So.2d 67, 69 (Miss. 1984). Here I regard it as permissible for state witnesses, in the course of describing the events of June 21, 1982, to have testified that Jimbo Stringer shot Nell McWilliams. What is not allowed is that the State go light years beyond what is reasonably necessary and introduce photographs showing the splattered remains of Nell McWilliams' brain on the floor and wall, followed by the testimony of a pathologist of the gruesome details of her death.
So long as the testimony involving such other crimes is incidental to the telling of the story of that charged in the indictment, there is no error. Where the other crime becomes the central crime for which the accused is in fact being prosecuted, there is error. To be sure, the outer limits of this exception to the rule are and necessarily must remain fuzzy. The touchstone is and always remains the concept of relevancy which in turn is anchored to the charge in the indictment. What is clear, however, is *952 that when the proof offered by the State respecting a crime other than that charged in the indictment is so extensive that it would be that which one would expect if the other crime were the one for which the accused is on trial, the outer bounds of relevancy have been exceeded.
For this reason and because I regard this error as substantially prejudicial for the reasons noted above, I would reverse the conviction and sentence and remand the entire case for a new trial.

IV.
There are in the majority opinion discussions of many issues beyond that mentioned above. I concur with what the majority opinion decides regarding Points I, II, III, V, VI, X, XIV and XVIII regarding the guilt phase of the trial below. My dissent from Point IV is the majority fails to perceive that its analysis regarding the gruesome photographs, etc., may rationally compel but one result: reversal of Jimbo's conviction. If anything the photographs and other testimony discussed in this separate opinion are more relevant at sentencing phase where other crimes are most important, than at the guilt phase, where they are not.
Because I would reverse Stringer's conviction and remand the entire case for a new trial, I would not reach any of the sentencing phase issues, with one exception. Thanks in no small part to the excellent analysis of the point by counsel made at oral argument, I would hold that on remand Jimbo Stringer may be re-exposed to the death penalty consistent with established notions of double jeopardy and collateral estoppel. See Point VIII of the majority opinion.
The collateral estoppel point is easy. The adjudication at the sentencing phase of Jimbo's first trial  where the indictment charged him with the capital murder of Nell McWilliams  simply does not arm Jimbo with a factual finding that would be inconsistent with a determination on remand here that he should suffer death. See Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); Sanders v. State, 429 So.2d 245 (Miss. 1983). Because that first sentencing jury failed to agree, it follows that there are no findings of fact emanating from that "verdict".
The double jeopardy point is a bit closer. First, it is clear that the sentencing phase of a capital murder trial is regarded as a separate and independent exposure to jeopardy. A final adjudication that an accused should not suffer death forever precludes re-exposure of that person to a sentencing jury with power to return a death penalty verdict for the same capital crime. Poland v. Arizona, 476 U.S. ___, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986); Arizona v. Rumsey, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984); Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981); Dycus v. State, 440 So.2d 246, 258-60 (Miss. 1983).
The appeal of Jimbo's double jeopardy argument is obvious. In fact, Jimbo was at his first trial exposed to the death penalty for his combined roles in the murders of Ray and Nell McWilliams. That trial resulted in a final judgment that Jimbo should not suffer death. Here, as explained above, Jimbo has again, for all practical purposes, been placed in jeopardy by the same evidence as was employed at his first trial.
Accordingly, Jimbo's argument to us is that, at the first trial, he was in fact placed in jeopardy of a death sentence for his role in the murders of Ray and Nell McWilliams, and that the final adjudication there made shields him from subjection to the same jeopardy here.
Without doubt, at the trial under review here, the State sought the death penalty because of Jimbo's role in both killings. The district attorney's final argument, quoted by the majority, makes clear that the State was in fact asking the jury to return a death verdict for the same reasons as were proffered at the first trial. Indisputably, Jimbo was in fact placed in a jeopardy he had survived at the first trial.
Powerful as is the rational appeal of Jimbo's argument, it runs aground upon *953 the settled reality that double jeopardy is a legalistic concept measured by the indictment, augmented by the collateral estoppel theory of Ashe and Sanders (which, as explained above, affords Jimbo no relief here). At the first trial Jimbo Stringer was placed in jeopardy of the death penalty under an indictment charging him with the capital murder of Nell McWilliams. That case went to the jury under sentencing instructions predicated solely upon Jimbo's conviction of the capital murder of Nell McWilliams. To be sure, the final adjudication at that first trial has forever insulated Jimbo from exposure to the death penalty for the murder of Nell McWilliams. But if affords him no protection in the instant proceedings where the indictment charges a legally separate and distinct crime, the capital murder of Ray McWilliams. Whether for purposes of the guilt phase or the sentencing phase, temporal proximity does not generate a juridical union of legally distinct criminal acts charged in separate indictments, notwithstanding the presence of a common nucleus of operative fact. Cf. Barnette v. State, 478 So.2d 800, 802 (Miss. 1985); Ohio v. Johnson, 467 U.S. 493, 104 S.Ct. 2536, 2540-41, 81 L.Ed.2d 425, 433 (1984); Pharr v. State, 465 So.2d 294, 299-301 (Miss. 1984); Missouri v. Hunter, 459 U.S. 359, 365-69, 103 S.Ct. 673, 677-79, 74 L.Ed.2d 535, 542-44 (1983).

V.
In the end, while I dissent from the majority's refusal to reverse Jimbo's conviction, my view that the conviction is error infected necessarily carries with it the conclusion that Jimbo's death sentence should be vacated and the case remanded for a new trial on the question of sentence.
HAWKINS, P.J., and SULLIVAN, J., join in this opinion.
ANDERSON, Justice, dissenting.
I respectfully dissent.
While I agree that there was serious prosecutorial misconduct in this case, I am of the opinion that the jury in the sentencing phase made certain findings that cannot be attributed to the prosecutor's blunders, and that these findings are sufficient to support a valid imposition of the death penalty.
The jury found six aggravating circumstances: (1) the defendant contemplated that life would be taken during the crime; (2) the killing was intentional, and Jimbo Stringer shared in the intent; (3) the killing occurred while the defendant was committing a felony, to-wit, armed robbery; (4) the killing was committed for pecuniary gain; (5) the killing was committed for purposes of avoiding arrest and (6) the killing was especially cruel, heinous or atrocious.
The nature of the inflammatory appeals made by the prosecutor was such that they could have influenced the sentencing jury as to only one of the six aggravating circumstances  the finding that the crime was especially cruel. Even if we assume that but for the prosecutor's improprieties, no reasonable jury could have so characterized this crime  an assumption that would involve us in considerable pretense  the other five aggravating circumstances would still stand. The majority itself recognizes the rule of Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), which states that where a death penalty is supported by findings of multiple aggravating circumstances, the infirmity of one of the findings does not necessarily taint the others. This seems especially true of a case like the present one, where the jury did not specifically recognize any mitigating circumstances. They may well have thought that there was nothing to be outweighed by the aggravating circumstances.
The prosecutor's conduct is to be deplored. Nevertheless, it tainted only part of the sentencing phase. The untainted evidence of other aggravating circumstances was sufficient to support the imposition of the supreme penalty. I would affirm.
NOTES
[1] As of January 1, 1986, relevant evidence is defined in our law as

evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
Rule 401, Miss.R.Ev.
[2] I do not regard the provisions of Rules 401-403, Miss.R.Ev., effective January 1, 1986, as accomplishing anything other than a restatement in rule form of legal principles long in effect in this state.
[3] See Stringer v. State, 491 So.2d 837 (Miss. 1986).